Receipt number AUSFCC-7232943

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TODD HENNIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. ___21-1654 L___ |
| vs. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | Judge: _____ |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**COMES NOW** Plaintiff Todd Hennis, by and through his attorneys, the New Civil Liberties Alliance, and for his cause of action against Defendants, states and alleges as follows.

### PARTIES

1. Plaintiff Todd Hennis is a citizen of the State of Colorado, with an address of 15100 Foothill Road, Golden, Colorado 80401. He is the current owner of the real property located in San Juan County, Colorado, that is the subject of this lawsuit. He has standing to bring this action.

2. Defendant United States of America ("Government" or "Defendant"), by and through its instrumentality, the Environmental Protection Agency ("EPA"), caused the environmental catastrophe that preceded the invasion, occupation, taking and confiscation of Plaintiff's property. Defendant, by and through its instrumentality the EPA, has coercively sought and obtained access to Plaintiff's property to install and operate a water treatment facility and related infrastructure, and to engage in other remedial activities.

1

3. The Government has invaded, occupied, used, and physically taken Plaintiff's property without just compensation in violation of the Fifth Amendment to the United States Constitution.

4. Plaintiff seeks just compensation from Defendant for the damages it has caused to and for the physical taking of his property.

## JURISDICTION

5. The United States Court of Federal Claims has jurisdiction under the Tucker Act to adjudicate any claim against the United States founded upon the Constitution.

6. This Court has jurisdiction over this action and over the parties pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because Plaintiff's claims against the Government are founded on the U.S. Constitution.

7. The Tucker Act waives sovereign immunity and provides jurisdiction for claims brought pursuant to the Fifth Amendment to the United States Constitution.

8. Plaintiff is asserting a constitutional claim in excess of $10,000.  This Court's jurisdiction is therefore exclusive.  28 U.S.C. § 1346(a)(2).

9. "We have long recognized that property owners may bring Fifth Amendment claims against the Federal Government as soon as their property has been taken. The Tucker Act, which provides the standard procedure for bringing such claims, gives the Court of Federal Claims jurisdiction to 'render judgment upon any claim against the United States founded either upon the Constitution' or any federal law or contract for damages 'in cases not sounding in tort.' 28 U.S.C. § 1491(a)(1). *Knick v. Township of Scott, Pennsylvania*, 139 S.Ct. 2162, 2170 (2019).

10. "'If there is a taking, the claim is '"founded upon the Constitution"' and within the jurisdiction of the Court of Claims to hear and determine.' *United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). And we have explained that 'the act of taking' is the event which gives rise to the claim for compensation.' *United States v. Dow*, 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958)." *Id*.

11. Plaintiff has suffered an injury-in-fact that is traceable to the Government's actions and is redressable by a favorable decision from this Court.

## STATEMENT OF FACTS

## I.     BACKGROUND

12. The headwaters of the Animas River begin in the San Juan Mountains of southwestern Colorado.  The confluence of streams—Mineral Creek, Cement Creek, and the Upper Animas—define the Upper Animas River basin.  The river basin contains hundreds of inactive or abandoned mines.  Among them is the Gold King Mine located on the slope of Bonita Peak.

13. The Gold King Mine was discovered in 1887, with ore production beginning in 1896.  The Gold King Mine contains numerous workings on seven levels ranging from 11,440 feet to 12,300 feet above sea level.

14. The lowest level of the Gold King Mine was renamed the "American Tunnel" in 1959.  The American Tunnel (portal elevation 10,617 feet above sea level) is the lowest transportation and ore-haulage level of the Gold King Mine and the Sunnyside Mine, which is adjacent to the Gold King Mine.

15. In 1988 Sunnyside Gold Corporation (the owner of the neighboring Sunnyside Mine) overhauled and upgraded an existing water treatment facility at the historic town of

Gladstone, the purpose of which was to receive and treat the acid mine drainage from the American Tunnel.  Such operations on the Gladstone Property included the treatment of water to a quality level that could support aquatic life.

16. Sunnyside Gold operated the Treatment Facility on the Gladstone Property to capture and treat the discharges from the American Tunnel in compliance with federal Clean Water Act regulations and Colorado-issued discharge permits.  Based upon a Consent Decree entered into with the Colorado Water Quality Control Division ("WQCD"), Sunnyside Gold discontinued using the Gladstone Treatment Facility in 2005.

17. Water quality in the Animas River was improving while the Gladstone Treatment Facility was in operation.  Once it was shut down the water quality in the Animas River dropped dramatically.

18. Plaintiff Todd Hennis acquired the Gold King Mine and the Gladstone Property in 2005. The Gladstone Property is made up of three mining claims: (1) the Herbert Placer (M.S. #13562); (2) the Anglo Saxon (M.S. #14875); and (3) the Harrison Millsite (M.S. #14710). The Gladstone Property is roughly 33.4 acres of land.  The Gladstone Property address is 6736 County Road 110, Silverton, Colorado 81433.

19. The Gladstone Property has historically been used for a variety of purposes, including for water treatment, light and heavy industrial activities, storage of industrial equipment, as a staging area for access to and operations of surrounding mines, high density town site (the historical Town of Gladstone, Colorado), and other large-scale activities.

20. Since the initial acquisition of the Gladstone Property, Plaintiff has spent substantial funds improving said property.

## II.     DEFENDANT'S BREACH OF THE GOLD KING MINE

21. On August 5, 2015, EPA's contractor, Environmental Restoration, LLC ("Environmental Restoration"), as directed and supervised by EPA and the Colorado Division of Reclamation, Mining and Safety ("DRMS"), used an excavator to dig away tons of rock and debris that sealed the portal of the Gold King Mine.  By breaching the collapsed portal of the Gold King Mine, EPA and Environmental Restoration released a toxic sludge of over three million (3,000,000) gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River watershed in San Juan County in southwestern Colorado.

22. Water had been accumulating in and seeping from the Gold King Mine portal for years. EPA was well aware of the fact that the Gold King Mine was filled with water, as both Colorado's records and EPA's own work plan highlighted the risk of a significant blowout if workers attempted to dig away the blockage.  EPA ignored this long-understood and well-established risk.

23. EPA not only knew that water had been building up in the Gold King Mine but was also aware such water was highly acidic and laced with heavy metals.

24. EPA officials knew of the blowout risk associated with any activity that involved the breach of the Gold King Mine portal.

25. EPA gained access to the Gold King Mine in 2008 through an agreement with Plaintiff and San Juan Corporation (a company controlled by Mr. Hennis).  That agreement allowed EPA, the United States Bureau of Land Management ("BLM"), and DRMS to enter the Gold King Mine site and other properties owned by Plaintiff for the purpose of monitoring the situation involving the integrity of the mine.  When EPA sought to renew the agreement

in late 2010, however, Plaintiff refused to grant access to the Mine and surrounding properties based on his concern that EPA would create a "pollution disaster."

26. On May 12, 2011, EPA served Plaintiff with an "Administrative Order Directing Compliance with Request for Access" ("2011 Administrative Order") and threatened him with fines upwards of $37,500 *per day* if he did not allow the access as demanded. Considering those threats, and in response thereto, Mr. Hennis had no choice but to accede to EPA's demand for access.  Plaintiff and EPA renewed the access several more times, including on August 8, 2014 and lasting through the end of 2015.  Such renewals were all premised on the Government's threat that Plaintiff would be subjected to fines of up to $37,500 *per day* if he did not give such access.

27. The scope of the Government's access to and use of Plaintiff's property pursuant to the 2011 Administrative Order did not include the construction and operation of a water treatment facility on the Gladstone Property.

28. EPA had considered drilling into the Gold King Mine from above in order to directly measure the water level before beginning any excavation work at the entrance, as was done at nearby mines in 2011.  A hydraulic pressure test would have left no doubt that it was unsafe to remove the backfill (sealing the portal) and that EPA needed to take additional precautions to prevent its "excavation-induced failure."  Had EPA simply followed this common practice—and its own precedent—it would have discovered that the Gold King Mine contained a vast quantity of highly pressurized water.  If EPA had pursued this approach, it would have been able to determine the water level in the mine and changed its course of action, thereby avoiding this disaster.

29. Steven Way, EPA's On-Scene Coordinator and lead official at the Gold King Mine (who was on vacation on the day of the blowout), had instructed the EPA and DRMS employees, as well as EPA's contractor (Environmental Restoration), *not* to excavate the earthen debris blocking the portal and *not* to drain the mine without first setting up the equipment necessary to handle the discharge.

30. Mr. Way understood the hazards at the site and told the crew to wait to excavate until after he had returned from vacation and consulted with an engineer from the United States Department of Interior's Bureau of Reclamation ("USBR") about the risks of EPA's actions at the site. The USBR's engineer was scheduled to conduct an on-site review of the plan of action for the Gold King Mine on August 14, 2015.

31. Hays Griswold was the EPA official in charge of the Gold King Mine while Mr. Way was on vacation. Mr. Griswold was acting within the scope of his employment as the official in charge of the Gold King Mine as discussed herein.

32. On July 29, 2015, Mr. Way emailed individuals from the EPA, DRMS and the EPA contractors with specific instructions about work at the site during the week of August 3, 2015.

33. Mr. Griswold arrived at the Gold King Mine work site on the morning of August 4, 2015. With an incomplete safety plan, an inadequate site evaluation, and lacking the necessary equipment on hand, the EPA crew began digging at the adit[1] around mid-morning. By the end of the day the crew had excavated all but a small portion of the drainage pipe that had been installed in 2009. Photographs of the excavated adit show what appears to be wooden

---

[1] An "adit" is the entrance to an underground mine which is horizontal (or nearly horizontal) by which the mine is to be entered, drained of water and ventilated, and by which minerals can be extracted at the lowest convenient level.

debris from the portal structure embedded in the earthen plug that held back the water within the Mine.

34. The following day, on August 5, 2015, more personnel from DRMS joined the EPA crew at the Level 7 adit to continue excavating.  That morning EPA excavated and removed the last remnants of the DRMS-installed pipes.  The EPA crew knew or should have known that they were removing material at least several feet below the roof of the adit.

35. The EPA crew next backfilled the excavated area in front of the plug and built a large earthen berm.  Having decided to drain the Mine—without testing the pressure, without having an adequate safety plan in place, without receiving USBR's input and advice, and without following any other directives—the crew dug a channel on the right side of the berm and positioned planks so that water flowing from the adit could be directed to the drainage channel that DRMS had previously installed.

36. The EPA crew then resumed digging at the mouth of the adit, when the operator soon reported hitting a "spring."  The EPA crew neither attempted to backfill the adit, plug the "spring," nor otherwise act to stop the water from flowing out of the Mine.  Within minutes, the "spring" started spurting and the flow surged, culminating in the massive blowout of the Gold King Mine.  It was ultimately determined that the work crew had not hit a "spring" at all, but instead had breached the Gold King Mine portal and begun releasing three million gallons of acid mine drainage and sludge, and 880,000 pounds of metals.

37. Photographs of EPA's work at the site on August 4 and 5 show that Mr. Griswold and the work crew did not follow Mr. Way's instructions.  Nor did they follow the contractor's existing work plan.  For example, the EPA crew, under Mr. Griswold's direction, excavated toward the adit floor at the level of the drainage pipes that had been earlier installed.  Mr.

Way had instructed the work-crew that it was necessary for them to have a pump, hose, and stinger pipe on hand before removing *any* material at the level of the two pipes.

38. Photographs taken on August 4 and 5 confirm that the excavation team was excavating at the level of the drainage pipes, toward the adit floor, without a pump, hose, or stinger on hand.

39. The combination of EPA's decision not to test for hydrostatic pressure, and Mr. Griswold's failure to follow Mr. Way's directions (to *not* excavate the portal while Mr. Way was on vacation, to wait for the USBR engineer to evaluate the plans, and how to excavate the materials), was a recipe for disaster. Contrary to all instructions, the work crew dug directly toward the earthen material holding back millions of gallons of acid mine drainage and waste.

40. Mr. Griswold eventually admitted that he and other EPA personnel knew the blockage could be "holding back a lot of water," and that others in the group also had such knowledge. The EPA work-crew on site on August 5, 2015 thus understood the hazards of breaching the collapsed portal of the Gold King Mine prior to commencing the work that day.

41. The EPA employees on site, ignoring the instructions of the lead official (Mr. Way), and disregarding their own knowledge of the risks of the project, directed, instructed, supervised and allowed Environmental Restoration to dig into the portal. They did so without verifying the hydraulic pressure in the Mine and without taking any necessary precautions (such as having equipment available to handle the discharge). The consequences of those decisions and actions have been catastrophic.

42. EPA and its employees were entirely unprepared for the consequences of breaching the Gold King Mine.

43. EPA and its employees failed to mobilize the necessary equipment to contain the water and heavy metals that they knew were in the Gold King Mine at the time they breached the portal.

44. EPA and its employees failed to construct an adequate embankment, berm, dam or other structure to contain the water and sludge they released from the Gold King Mine.

45. EPA and its employees failed to plan or prepare for handling and treating the acid mine drainage and heavy metals they released from the Gold King Mine.

46. EPA and its employees, the very agency and individuals entrusted to protect the environment, violated their own directives, protocols and procedures, while also ignoring the well-understood risk of undertaking this operation, thereby triggering a massive release of pollutants onto the private property below the Gold King Mine (owned by Plaintiff Todd Hennis) and into the waterways downstream.

47. EPA's conduct was reckless, deliberately indifferent, and outrageous.   EPA and its employees knew of and disregarded the substantial risk of serious harm to Plaintiff and his property rights.

48. EPA released a massive sickly yellow/orange (turmeric-colored) plume of contamination from the Gold King Mine.   The waters and sludge they released cascaded down the embankment outside of the Gold King Mine, rushed down the mountainside, and quickly overwhelmed Cement Creek, a tributary of the Animas River.  This plume of contaminated water, often referred to as "the yellow river seen 'round the world," then snaked down the Animas through Colorado and into New Mexico, to the confluence with the San Juan River.

It traveled through New Mexico, the Navajo Nation, and into Utah, reaching Lake Powell one week later.

49. EPA's intentional breach of the Gold King Mine resulted in the release of toxic heavy metals such as lead, cadmium, copper, mercury, arsenic, beryllium, zinc, selenium, and iron, which first flooded across Plaintiff's real property below and into Cement Creek for its journey downstream.

50. The EPA employees and contractors who intentionally breached the Gold King Mine failed to notify their EPA supervisors for over an hour after the blowout occurred. EPA did not issue a press release until around midnight that day.  EPA did not notify residents of the spill until twenty-four hours after it had occurred.  EPA waited an entire day before notifying downstream mayors, health officials, families, farmers, ranchers, fishermen, and recreationists that the water they were using, drinking, irrigating with, and paddling in was contaminated with heavy metals such as lead, cadmium, copper and zinc.

51. On August 8, 2015, the then-Governor of Colorado, John Hickenlooper, declared the affected area a disaster zone.

52. It is irrefutable that EPA was the cause and culprit of the Gold King Mine blowout, a fact that it has repeatedly admitted since that tragic day.  *See* Exhibits A and B.

53. EPA is an agency and instrumentality of the United States Government.

54. It is thus irrefutable that the United States is responsible for all of the damages, injury, loss of revenue, and consequences of breaching the Gold King Mine, and for ensuring that anyone affected by this disaster, including Plaintiff Hennis whose property was taken by the United States to respond to said disaster, is properly, fairly and adequately compensated and made whole.

### III.   CONTAMINATION, PHYSICAL OCCUPATION, USE AND TAKING OF PLAINTIFF'S PROPERTY

55. Shortly after EPA caused the Gold King Mine blowout in August 2015, Mr. Hennis verbally authorized the Government to temporarily use a portion of the Gladstone Property for an emergency staging area for equipment and supplies, recognizing that time was of the essence in addressing the environmental catastrophe caused by EPA.  Mr. Hennis did not grant EPA permission to construct a water treatment facility on his property.   The government paid no consideration for the temporary use of Plaintiff's property.

56. Plaintiff never intended for EPA to occupy and use his property indefinitely and never gave the United States Government permission to do so.

57. Mr. Hennis specifically instructed EPA personnel that he was not authorizing EPA to use the Herbert Placer portion of the Gladstone Property for its operations.

58. Plaintiff allowed EPA to temporarily use a portion of his property with the understanding that since EPA had admittedly caused the environmental catastrophe, and were responsible for all of the related damages, the United States Government would negotiate and act in good faith in order to enter into a lease or other rental agreement to pay just compensation for the use of his property.

59. Ignoring Mr. Hennis's instructions and the scope of the access that was granted, EPA constructed a $ 2.3 million-dollar water treatment facility on the Herbert Placer portion of the Gladstone Property, later asserting that such location was "optimal for the treatment facility."  EPA completed construction of this facility in November 2015.

60. The BLM owns real property adjacent to and in the vicinity of Plaintiff's property.  EPA could have constructed its water treatment facility on those lands.  Because of the location,

attributes and historical use of Plaintiff's property, EPA made the decision to build its water treatment facility and related infrastructure on the Gladstone Property.

61. A large concrete pad (approximately three-feet thick) was already located on the Herbert Placer portion of the Gladstone Property. EPA constructed its water treatment facility on top of this concrete pad, despite having no authority from Mr. Hennis to do so, thereby physically taking and confiscating a valuable piece of property and preventing Mr. Hennis from using it for his own purposes. The Government paid no consideration for the use of this concrete pad.

62. EPA concluded that the Gladstone Property was a "prime location" and optimum property for construction and operation of its water treatment facility. EPA based its decision on the historical use of this area for water treatment purposes, the existence of other water treatment activities within the immediate area, the terrain (being a relatively flat area where the facility and related infrastructure could be placed), the availability of a well-maintained road/access to this property, the proximity to the Gold King Mine and the American Tunnel, and the fact that the infrastructure (such as the concrete pad) was already in place.

63. EPA constructed a series of settling ponds on Plaintiff's property to retain and treat the water flowing from the Gold King Mine. EPA also installed piping and surge protection and constructed a water conveyance system from the portal to the water treatment plant that it constructed at the location of a former water treatment facility on Plaintiff's Gladstone Property.

64. EPA knew at the time that it took Mr. Hennis's property that this area had been historically used for industrial operations and activities.

65. Upon invading and occupying Mr. Hennis's property, and without permission, EPA proceeded to gather and dispose of mining supplies and personal equipment that he owned and had stored on his property. EPA only agreed to pay for such supplies and equipment after ignoring repeated demands from Plaintiff.

66. Since November 2015, EPA has continuously treated the discharge of acid mine drainage from the Gold King Mine at the water treatment plant that it constructed on Mr. Hennis's property. EPA has paid no consideration to Plaintiff for the physical taking and use of his property in this manner.

67. EPA's water treatment process involves running the water from the Gold King Mine into the treatment plant via pipeline(s). The untreated water is piped into large tanks where an additive is mixed in to bind with the contaminants, sludge and minerals, which then drop to the bottom of large tanks. The contaminants and other solid materials are then pushed into large porous bags, where the waste continues to dry. The solid waste is eventually spread across a large area on Mr. Hennis's property for further drying.

68. EPA's water treatment operations involve the storage of mine waste, solids and other contaminants on Plaintiff's real property. EPA has never compensated Plaintiff for the use of his property to store such waste. EPA has not yet informed Plaintiff of what it intends to do with this waste in the long term nor how it intends to restore his property.

69. EPA has continuously expanded its physical "footprint" on Plaintiff's property since it first set up its treatment operations, with such expansion involving the need to use more and more of his property to store the contaminants/sludge/waste byproduct.

70. The United States Government, through EPA, has operated its water treatment facility on Plaintiff's real property for over five years and has variously indicated that it intends to continue to operate the facility for an additional five, seven or eight more years.

71. The Government has incurred well over $44,500,000 in past response costs related to the environmental catastrophe that it created when it destroyed the Gold King Mine portal. The Government has estimated that it will incur an additional $20.7 million in future response costs at this site.  None of those costs include compensating Plaintiff for the invasion, occupancy, use and physical taking of his property.

## IV. DEVELOPMENT AND USE OPPORTUNITIES FOR PLAINTIFF'S PROPERTY

72. Plaintiff's properties are located next to the Silverton Mountain Ski Area.  His property is the only developable land within the vicinity and is worth a substantial amount of money for that reason.

73. Plaintiff has had and continues to have discussions with developers related to developing his Gladstone Property into a resort area with condominiums and other accommodations to serve the Silverton Mountain Ski Area.  EPA's operation of its water treatment facility on his property has prevented and is currently preventing Plaintiff from moving forward with such development opportunities and plans.

74. Plaintiff has had other development opportunities related to the Gladstone Property.

75. Defendant's open-ended occupation and use of Plaintiff's Gladstone Property has obstructed Plaintiff's development plans.

76. Defendant's physical occupation, use and taking of Plaintiff's property directly interferes with his use and enjoyment of said property for the foreseeable future.

77. So long as Defendant intends to continue to operate the water treatment facility, to store the waste from such operations, to conduct other investigative and remedial activities, and to otherwise access and occupy Plaintiff's property, Plaintiff is immobilized from taking any substantial steps toward the development of it.   As a practical matter, no such development can occur because Plaintiff is precluded from interfering with Defendant's operations on the property.

78. Defendant's activities on the Gladstone Property, including breaching the Gold King Mine in the first place, the flooding of the property, the construction and operation of the water treatment facility, and the use of such property to store the waste, have negatively affected the property, created a stigma surrounding the property, and diminished its economic and market value.   The EPA-caused Gold King Mine disaster received substantial publicity throughout the country and world.  Plaintiff's property was "ground zero" of this catastrophe and continues to be publicly tied to Defendant's ongoing efforts to clean up the environmental mess that EPA created.

## V.   PLAINTIFF'S MINERAL RIGHTS ON THE PROPERTY

79. On December 20, 2017, President Trump issued Executive Order 13817 (82 Fed.Reg. 246), entitled "Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals." According to Executive Order 13817, the United States is heavily reliant on imports of certain mineral commodities "that are vital to the Nation's security and economic prosperity."   Recognizing the vulnerability associated with that state of affairs, President Trump declared that "[a]n increase in private-sector domestic exploration, production, recycling, and reprocessing of critical minerals, . . . will reduce our dependence on imports, preserve our leadership in technological innovation, support job creation, improve our

national security and balance of trade, and enhance the technological superiority and readiness of our Armed Forces, which are among the Nation's most significant consumers of critical minerals." *Id*.

80. Executive Order 13817 instructed the Secretary of Interior ("DOI"), in coordination with the Secretary of Defense and in consultation with other agencies, to publish a list of critical minerals in the Federal Register within 60 days. *Id*.

81. In compliance with Executive Order 13817, and on February 16, 2018, the DOI issued a "Draft List of Critical Minerals." *See* 83 Fed.Reg. 7065. Such list includes 35 mineral commodities "deemed critical under the definition provided in ... Executive Order [13817]." These minerals include, as relevant here, tellurium, tungsten, and bismuth.

82. On September 30, President Donald J. Trump issued Executive Order 13953 entitled "Addressing the Threat to the Domestic Supply Chain from Reliance on Critical Minerals from Foreign Adversaries and Supporting the Domestic Mining and Processing Industries." *See* 85 Fed.Reg. 62539. The purpose of this Executive Order was to declare a national emergency in relation to the production of the 35 critical minerals identified by DOI.

83. Tellurium is the world's fifth rarest metal.

84. Tungsten is also one of the world's rarest metals.

85. The Gold King Mine is not only one of the largest, if not the largest, but also the most accessible deposit of tellurium in the United States.

86. The Gladstone Property sits on a large tungsten/molybdenum deposit.

87. So long as Defendant intends to continue to operate the water treatment facility, to store the waste from such operations, to conduct other investigative and remedial activities, and

to otherwise access and occupy Plaintiff's property, Plaintiff is immobilized from taking any substantial steps toward the development of his mineral rights.  As a practical matter, no such development can occur because Plaintiff is precluded from interfering with the Defendant's operations on the property.

88. Defendant has thus blocked Plaintiff from exploring, mining, or otherwise developing his mineral assets.

89. Defendant has physically occupied and taken Plaintiff's minerals and mineral rights.

### VI.   THE GOVERNMENT USED COERCION TO GAIN ACCESS TO PLAINTIFF'S PROPERTY

90. Defendant physically invaded, seized, and occupied Mr. Hennis's real property in violation of his basic constitutional rights.  It first installed a water treatment facility without notice or permission.  It then threatened to impose soul-crushing civil penalties should Mr. Hennis attempt to exercise his constitutional rights to exclude the Government from his property.

91. EPA began demanding that Plaintiff sign an access document for the Gladstone Property in November 2015. Plaintiff refused and requested EPA pay compensation for the use of his property. EPA responded by acknowledging that Plaintiff had not "voluntarily" agreed to sign an access agreement and threatened to pursue legal action to gain such access if he refused to sign its document.

92. In November 2015, the Government misled Plaintiff regarding the nature and scope of its authority to construct and operate a water treatment facility on his property, claiming that a previous document signed by Plaintiff provided for such authority.  The Government's misrepresentations in that regard were designed to coerce Plaintiff into granting access to his property.

93. The Government also threatened Plaintiff that if he did not allow access to and the use and occupation of his property that EPA would bring a lawsuit against him.

94. In November 2015, Plaintiff signed the first EPA-drafted "Consent for Access to Property" document for the Gladstone Property. EPA has continued to coerce Plaintiff into signing a series of such documents in the ensuing 5 or more years. Each of them, by their terms, had an end date of approximately six months to one year later. Plaintiff did not participate in drafting such documents. Rather, the Government presented them to him and instructed him to sign them, the "or else" being clear in EPA's correspondence. The Government has never paid any consideration in exchange for Plaintiff's signing of these documents.

95. Plaintiff involuntarily accepted the Government's terms for access to and occupation of the Gladstone Property. The circumstances were such that Plaintiff had no alternative. These circumstances were created by the Government's breach of the Gold King Mine, which then necessitated the Government's use and physical occupation of his property and coercing Plaintiff into providing access to his property.

96. The Government has failed to pay any consideration in exchange for Plaintiff's signing of the "Consent for Access to Property" documents. The Government instead coerced Plaintiff into signing them by threatening to bring an administrative action against him if he did not do so.

97. In April 2020 EPA again demanded that Plaintiff sign a "Consent for Access to Property" document, providing access up through December 31, 2020. Plaintiff signed that document on April 16, 2020. The Government provided no consideration for Plaintiff signing this document. This was the last such document that Plaintiff has signed. The Government continues to physically occupy, use and control the Gladstone Property.

98. None of the consent for access documents signed by Plaintiff required him to waive any rights or entitlements that he has, with Plaintiff retaining the right to seek compensation for the Government's physical occupancy, use and taking of his property. EPA has acknowledged Plaintiff's repeated demands that the Government compensate him for using and physically taking his property.

99. In November 2020, EPA demanded that Plaintiff sign an eight-year "Consent for Access to Property," to be in effect up to and including December 31, 2028. Plaintiff refused, instead agreeing to extend such access only up to February 28, 2021 in the hopes that EPA would finally negotiate in good faith to pay for the past and future use of his property. EPA responded on January 6, 2021 by making good on its threats and serving Plaintiff with an "Administrative Order Directing Compliance with Request for Access" pursuant to "the authority vested in the President of the United States by Section 104(e)(5) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. § 9604(e)(5), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR § 300.400(d)(4)" ("January 6, 2021 Administrative Order").

100. The January 6, 2021 Administrative Order required Plaintiff to grant EPA (and other state and federal agencies) "entry and access" to the Gladstone Property, and to "refrain from interfering with access to the Gladstone Property or with other activities conducted within the scope of this Order…." The January 6, 2021 Administrative Order required Plaintiff to provide access to and use of his property or face a civil enforcement proceeding pursuant to CERCLA (42 U.S.C. § 9604(e)(5)) through which EPA would seek

penalties of $59,017 *per day* for any period of time during which EPA concludes that he is not complying with its demands.

101.     Plaintiff responded by pointing out that he had never blocked access to the Gladstone Property, although he had consistently demanded that the United States pay just compensation for the physical occupation, use and taking of his property.

102.     On January 27, 2021, EPA issued a "Modified Administrative Order Directing Compliance with Request for Access ("Modified Administrative Order").  EPA again threatened Plaintiff with penalties of up to $59,017 *per day* for any period of time during which EPA believes he is not complying with its demands.  One primary difference between the January 6, 2021 Administrative Order and the Modified Administrative Order is that EPA no longer required Plaintiff to affirmatively state his intent to comply with the latter by agreeing to allow ongoing access.  EPA also confirmed that Plaintiff had not waived his right to pursue a taking claim against Defendant: "Nothing in this Order constitutes a waiver, bar, release, or satisfaction of or a defense to any cause of action which Respondent has now or may have in the future against EPA, the United States, or against any entity which is not a party to this Order."  The Modified Order remains in effect until the earliest of three events: (1) Plaintiff signs a five-year consent; (2) Plaintiff enters into a lease agreement for the Gladstone Property; or (3) December 31, 2025.

103.     Plaintiff did not freely sign the "Consent for Access to Property" documents but was instead forced to accede to EPA's coercive demands beginning in 2011 (with EPA threatening fines of $37,500 *per day* unless he provided access to the Gold King Mine and other lands), and most recently in January 2021, with the issuance of a Modified Administrative Order threatening him with penalties of $59,017 *per day*.

104.     Plaintiff did not voluntarily accept the Government's terms for the "Consent for Access to Property" documents.  The circumstances were such that Plaintiff had no alternative to signing such documents.  These circumstances were created by the Government and were the result of the Government's coercive acts.

105.     Plaintiff has repeatedly communicated to the EPA and made clear his demand for just compensation for his property as occupied, used and taken by the Government.

106.     Plaintiff has received no consideration or compensation from the Government for the physical occupation, use and taking of his property.

107.     Plaintiff did not consent to the Government's occupation, use and taking of his property without just compensation.

108.     The Government's presence and activities on Plaintiff's property confer no special benefit on Plaintiff; the Government is responsible for the contamination of his property, and for addressing the environmental catastrophe that EPA created.

109.     The Government had and continues to have an obligation to negotiate with Plaintiff in good faith with regard to the terms and conditions for physically occupying, using and taking his property.

110.     The Government has refused to negotiate with Mr. Hennis in good faith or treat him fairly, rejecting his demand to pay the fair market value for the past and future occupation, use and taking of his property.

111.     The Government has refused to make monthly rental or lease payments for the past occupation and use of the Gladstone Property from August 5, 2015, to the current date.

112.     The Government has been physically squatting on Plaintiff's property for over five years, refused to make any rental payments, ignored the actual value of the property, and

rejected Plaintiff's demand to pay fair rental value and/or fair market value for the occupation, use and taking of his property since August 2015.

113.     Defendant has failed and refused to pay Plaintiff just compensation for the physical invasion, occupancy, use and taking of his property.

### VII.    VALUE OF GLADSTONE PROPERTY

114.     The Gladstone Property was inspected by qualified real estate appraiser Robert Stevens, MAI, SRA, on May 28, 2020, and June 19, 2021.

115.     Mr. Stevens has appraised Plaintiff's Gladstone Property as having a Fair Rental/Lease Market Value of at least $ 11,000 per month for that period of time from August 5, 2015 up to and including the date on which the Government pays for the invasion, occupation, use and taking of Plaintiff's property.  Such value as of August 3, 2021 is no less than $ 792,000.00.

116.     Mr. Stevens has appraised Plaintiff's Gladstone Property as having a Fair Market Value of at least $ 2.2 million dollars as of August 5, 2015.

117.     Mr. Stevens has appraised Plaintiff's Gladstone Property as having a Fair Market Value of at least $ 3.0 million dollars as of January 6, 2021.

118.     The foregoing Fair Rental/Lease Market Values and Fair Market Values do not include interest due from the Government to Plaintiff.

### VIII.   THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION REQUIRES JUST COMPENSATION FOR THE PHYSICAL TAKING OF PRIVATE PROPERTY

119.     Plaintiff brings this lawsuit based on the United States Government's violation of the Fifth Amendment to the United States Constitution.

120.     Plaintiff seeks to recover just compensation for the Government's temporary (past and future rental/lease payments) and/or permanent physical taking of his property for public use, interest related thereto, along with an award of the costs, expenses and attorney's fees incurred in bringing this action.

121.     The Fifth Amendment to the United States Constitution provides in relevant part that "nor shall any person … be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

122.     A compensable taking occurs when the government physically invades or appropriates private property.

123.     A physical invasion or appropriation occurs when the government itself occupies the property or requires the landowner to submit to the physical occupation of his land.

124.     "The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom.  As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'"  *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2071 (2021).

125.     "The historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it.  Such an appropriation is perhaps the most serious form of invasion of an owner's property interests."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).

126.     "[A] state, by *ipse dixit*, may not transform private property into public property without compensation…."  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1031 (1992).

127.    The government's physical takings of property represent a greater affront to individual property rights.  *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002). When the government physically takes property "it has a categorical duty to compensate the former owner … regardless of whether the interest that is taken constitutes the entire parcel or merely a part thereof."  *Id*. at 322.

128.    The United States Supreme Court has held that "the plain language of the Takings Clause 'requires the payment of compensation whenever the government acquires private property for a public purpose….' (Citation omitted)." *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017).

129.    "Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Id*. at 1943.

130.    The purpose of the Takings Clause "is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id*. (Citations and internal quotation marks omitted).

131.    The Takings Clause places a condition on the government's power to interfere with property rights, instructing that "private property [shall not] be taken for public use, without just compensation." *Id*.

132.    "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019).

133.    "We have held that if there is a taking, the claim is founded upon the Constitution and within the jurisdiction of the Court of Claims to hear and determine. (Citation omitted).

And we have explained that the act of taking is the event which gives rise to the claim for compensation.  (Citation omitted)."  *Id*. at 2170.  (Cleaned up).

134.      "The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner."  *Id*.

135.      "That principle was confirmed in *Jacobs v. United States*, 290 U.S. 13, 54 S. Ct. 26, 78 L.Ed.142 (1933), where we held that a property owner found to have a valid takings claim is entitled to compensation as if it had been 'paid contemporaneously with the taking'—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time. (Citation omitted)."  *Id*.

136.      "*Jacobs* made clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it. Whether the government does nothing, forcing the owner to bring a takings suit under the Tucker Act, or whether it provides the owner with a statutory compensation remedy by initiating direct condemnation proceedings, the owner's claim for compensation 'rest[s] upon the Fifth Amendment.'"  *Id*. at 2170-2171.

137.      "Relying heavily on *Jacobs* and other Fifth Amendment precedents … *First English* [*Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)], held that a property owner is entitled to compensation for the temporary loss of his property. We explained that government action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation.  482 U.S. at 315, 107 S.Ct. 2378. Because of the self-executing character' of the Takings Clause 'with respect to compensation, a property owner has a

constitutional claim for just compensation at the time of the taking. *Ibid.* (quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972)).” *Id*. at 2171 (cleaned up).

138.    “The government's post-taking actions … cannot nullify the property owner's existing Fifth Amendment right: ‘[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation.’ (Citation omitted).” *Id*. at 2171.

139.    “In holding that a property owner acquires an irrevocable right to just compensation immediately upon a taking, *First English* adopted a position Justice Brennan had taken in an earlier dissent. See *id*. at 315, 318, 107 S.Ct. 2378 (quoting and citing *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 654, 657, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)). In that opinion, Justice Brennan explained that ‘once there is a ‘“taking,”’ compensation *must* be awarded’ because ‘[a]s soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation. *Id.*, at 654, 101 S.Ct. 1287.’” *Id*. at 2172.  (Emphasis in original).

140.    “*First English* embraced that view, reaffirming that ‘in the event of a taking, the compensation remedy is required by the Constitution.’ 482 U.S. at 316, 107 S.Ct. 2378; see *ibid*., n. 9. … Compensation under the Takings Clause is a remedy for the ‘constitutional violation’ that ‘the landowner has *already* suffered’ at the time of the uncompensated taking.  (Citations omitted).” *Id*.  (Emphasis in original).

141.    “A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place. The violation is the only reason compensation was owed in the first place. … The

availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care." *Id.*

142.     "A claim for just compensation brought under the Tucker Act is not a prerequisite to a Fifth Amendment takings claim—it *is* a Fifth Amendment takings claim." *Id.* at 2174 (emphasis in original).

143.     "But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation after a taking." *Id.* at 2175 (cleaned up).

144.     A property owner who prevails against the government for a permanent taking is entitled to "just compensation for the total value of his property." *Id.* at 2176.

145.     "On the federal level, Congress enabled property owners to obtain compensation for takings in federal court when it passed the Tucker Act in 1887, and we subsequently joined the state courts in holding that the compensation remedy is required by the Takings Clause itself." *Id.*

146.      The word 'property' in the Takings Clause means "the group of rights inhering in [a] citizen's relation to [a] ... thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.,* 323 U.S. 373, 378 (1945).

147.     Direct government appropriation and physical invasion of private property "give rise to '*per se* taking[s]' because they are 'perhaps the most serious form[s] of invasion of an owner's property interests, depriving the owner of the rights to possess, use and dispose of the property." *Horne v. Department of Agriculture,* 576 U.S. 350, 360 (2015) (internal citations and quotation marks omitted).

148.     "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property. See, *e.g., United States v. Pewee Coal Co.*, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (Government's seizure and operation of a coal mine to prevent a national strike of coal miners effected a taking); *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (Government's occupation of private warehouse effected a taking)." *Lingle v. Chevron*, 544 U.S. 528, 537 (2005).

149.     Where government requires an owner to suffer a permanent physical invasion of her property—however minor—a *per se* taking under the Fifth Amendment has occurred and the government must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking).

150.      Physical takings require compensation because of the unique burden they impose.

151.     "A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property— perhaps the most fundamental of all property interests. See *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–832, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Loretto, supra*, at 433, 102 S.Ct. 3164; *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)." *Id*. at 539-540.

152.     "In giving content to the just compensation requirement of the Fifth Amendment, this Court has sought to put the owner of condemned property 'in as good a position

pecuniarily as if his property had not been taken.' *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708 (1934)." *United States v. 564.54 Acres of Land, More or Less*, 441 U.S. 506, 510-511 (1979).

153.    The guiding principle of just compensation is that the *owner* of the condemned property must be made whole.  *Id*. at 516.

154.    "… [W]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Arkansas Game and Fish Commission v. United States*, 568 U.S. 23, 31 (2012) (Citations omitted).

155.    Government-induced flooding can constitute a taking.  *Id*. at 32.  In *Pumpelly v. Green Bay Co.,* 13 Wall. 166, 20 L.Ed. 557 (1872).  "[T]he Court held that 'where real estate is actually invaded by superinduced additions of water, earth, sand, or other material … so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.'  *Id*.  at 181."  *Id*. at 32.

156.    Once the government's actions have worked a taking of property, "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English*, 482 U.S. at 321, 107 S.Ct. 2378.

157.    When a property owner is forced to acquiesce to the government's physical occupation of his property, such acquiescence cannot negate a takings claim.  "[The] element of required acquiescence is at the heart of the concept of occupation." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (quoting *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987)).

158.     In those circumstances where the government delays payment of just compensation for the taking of property, the landowner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation. *Kirby Forest Industries, Inc. v. U.S.*, 467 U.S. 1, 10-11 (1984).

159.     Plaintiff is entitled to be fully and completely compensated for the Government's physical occupancy, use, taking, and contamination of his property, including interest on such amount from August 5, 2015 until such compensation is paid in full.

## IX.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### TEMPORARY PHYSICAL TAKING OF PRIVATE PROPERTY
### WITHOUT JUST COMPENSATION

160.     Plaintiff incorporates the allegations in all preceding paragraphs as though fully set forth herein.

161.     Plaintiff owns the Gladstone Property and has owned it at all times relevant to the facts and claims set forth in this Complaint.

162.     The Government's actions in breaching the Gold King Mine, releasing massive quantities of contaminated water and heavy metals, and flooding and contaminating Plaintiff's property, constituted a physical invasion of private and public property.

163.     The Government's releases from the Gold King Mine have interfered with and continue to interfere with Plaintiff's use and enjoyment of his Gladstone Property.

164.     The Government's access to, occupation of, and use of Plaintiff's property constitute a temporary physical taking of such property.

165.     The Government is responsible for contaminating, occupying, using and taking Plaintiff's property.

166.     Having failed to develop a plan of action for dealing with the water and waste that it knew would be released from the Gold King Mine once EPA breached the portal, the Government immediately confiscated Plaintiff's private property in order to intercept and treat the water draining from the Gold King Mine, drainage that continues to this day.

167.     The Government created the crisis at hand, and responded by invading, physically occupying, and taking for public use Plaintiff's real property to construct a water treatment facility, along with the infrastructure related thereto, and surrounding property to store the related waste produced from such facility.

168.     This EPA-created crisis and response does not and cannot eclipse Plaintiff's constitutionally protected property rights.

169.     The Government's access to, occupation of, and use of Plaintiff's property are intentional activities conducted under authority of federal law.

170.     The Government has never compensated Plaintiff for contaminating his property.

171.     The Government has never compensated Plaintiff for seizing his property to construct and operate a water treatment facility and for storing the related waste.

172.     The fair market rental or lease value of Plaintiff's property is based upon its highest and best use because a willing lessee and a willing lessor would consider the highest and best use in an actual transaction in the marketplace in agreeing on a rental or lease price. The highest and best use of Plaintiff's Gladstone Property includes its historical, current and prospective uses to which the property is physically adapted in the present or in the reasonably near future and for which there is a demonstrated demand.

32

173.    The Government's activities on Plaintiff's property, and its open-ended access to and work on the property, have deprived Plaintiff of his past and future use and enjoyment. These activities have precluded and continue to preclude Plaintiff's use and enjoyment of such property for its highest and best use and have destroyed or substantially diminished its market value.

174.    Plaintiff has suffered and will continue to suffer substantial economic harm as a result of the Government's actions, including in relation to the contamination of his real property from the waste that it released and discharged from the Gold King Mine, as well as the physical occupation and taking of his property for public use without just compensation.

175.    The Government's activities and continuing demand for access to the site have brought to a standstill Plaintiff's plans for a resort and residential development of his property, and have thwarted the possibility of any lease, sale or other meaningful economic use of the property.

176.    The long-term physical appropriation of Plaintiff's property for the Government's use benefits the Government at Plaintiff's expense, and indefinitely deprives Plaintiff of the enjoyment and effective use of his property.

177.    The Government, by destroying access to the Gold King Mine, and in locating the water treatment facility and operations on the Gladstone Property, has interfered with Plaintiff's mineral interests without due process and without just compensation.

178.    Plaintiff is entitled to just compensation for the Government's physical taking of his property for public use.  Total compensable damages include the lost fair market value of these critical minerals found on such property while the Government is occupying such

property, plus interest, as determined in accord with the substantial evidence of record and the law.

179.     The Government's physical invasion and occupation of the Gladstone Property effect a *per se* taking of private property for public use, for which the Government has provided no lease or rental compensation.  Such taking of private property for public use, without just compensation, violates the Fifth Amendment of the United States Constitution.

180.     The taking of Plaintiff's property is without Plaintiff's free and voluntary consent. Plaintiff acquiesced to the Government's access to and activities on his property only under the coercive threat of CERCLA enforcement and substantial penalties and liabilities.  The Government's access, physical occupation, taking and use of his property at this point in time is pursuant to the January 2021 Modified Administrative Order.

181.     Defendant's activities on and physical invasion of the Gladstone property, the construction and operation of the water treatment plant and related infrastructure, the storage of waste resulting from such water treatment activities, and the long-term work on the property, have precluded and continue to preclude Plaintiff's use and enjoyment of the property for its highest and best use and have also negatively impacted the property, and created a stigma surrounding the property, so as to destroy or substantially diminish its market value.

182.     As a result of Defendant's access to, occupation of, and use of such property, Plaintiff has suffered and will continue to suffer substantial economic harm. Plaintiff has been precluded from moving forward with developing the property for its highest and best use, and alternative uses that would impart significant market value are currently untenable or unavailable.

183.    Defendant's physical invasion, occupation and use of Plaintiff's property have affected the market value of the entirety of the Gladstone Property.

184.    Defendant's physical invasion, occupation and use of Plaintiff's property has interfered with Plaintiff's reasonable investment-backed expectations that the Gladstone Property would be timely and economically developed.

185.    Defendant's physical invasion, occupation and use of Plaintiff's Gladstone property constitutes a temporary physical taking of the property for public use, for which no just compensation has been made, in violation of the Fifth Amendment of the United States Constitution.

186.    Plaintiff demands full and just compensation for the damages caused by EPA's Gold King Mine release and all subsequent actions.  Despite repeated requests by Mr. Hennis, the Government has refused to step forward and take responsibility for the damages that he has suffered as a result of its actions, or to pay just compensation for the property that it has taken.

187.    Plaintiff is entitled to just compensation for the Government's contamination, physical invasion, occupation, taking and use of his property for public use, including both compensation for the specific areas of the property physically occupied, as well as severance damages to those portions of the property negatively impacted as a direct result of the Government's taking.  Total compensable damages include the lost fair market rental or lease value of the full Gladstone Property, and loss to mineral rights, plus interest, as determined in accord with substantial evidence of record and the law.

## SECOND CLAIM FOR RELIEF
### *IN THE ALTERNATIVE*
## INVERSE CONDEMNATION/UNCONSTITUTIONAL PERMANENT
## PHYSICAL TAKING OF REAL PROPERTY

188.　　Plaintiff incorporates the allegations in all preceding paragraphs as though fully set forth herein.

189.　　In the alternative to the First Claim for Relief set forth above, the Government's access to, physical invasion, occupation, and use of Plaintiff's property constitute a permanent physical taking of such property.

190.　　The Government's actions in breaching the Gold King Mine, releasing massive quantities of contaminated water and heavy metals, thereby contaminating the Animas River and San Juan River, as well as the surrounding environs, including Plaintiff's property, constituted a physical invasion of private and public property.

191.　　The Government's releases from the Gold King Mine have interfered with and continue to interfere with Plaintiff's use and enjoyment of his Gladstone Property.

192.　　The Government is responsible for contaminating, physically occupying, using, and taking Plaintiff's Gladstone Property.

193.　　The fair market value of Plaintiff's Gladstone Property is based upon its highest and best use because a willing buyer and a willing seller would consider the highest and best use in an actual transaction in the marketplace in agreeing on a purchase price.  The highest and best use of Plaintiff's property includes its historical, current and prospective uses to which the property is physically adapted in the present or in the reasonably near future and for which there is a demonstrated demand.

194.　　The Government's activities on Plaintiff's property, and its open-ended access to, occupation of, and work on the property have deprived Plaintiff of his past and future use

and enjoyment.  These activities have precluded and continue to preclude Plaintiff's use and enjoyment of such property for its highest and best use and have negatively impacted the property, and created a stigma surrounding the property, so as to destroy or substantially diminish its market value.

195.    Plaintiff has suffered and will continue to suffer substantial economic harm as a result of the Government's actions, including in relation to the contamination of his real property from the waste that it released and discharged from the Gold King Mine, as well as the taking of his property for public use without just compensation.

196.    The Government's activities and continuing demand for access to the site have brought to a standstill Plaintiff's plans for a resort and residential development of his property, and have thwarted the possibility of a sale or other meaningful economic use of the property.

197.    The long-term physical appropriation of Plaintiff's property for the Government's use benefits the Government at Plaintiff's expense, and indefinitely deprives Plaintiff of the enjoyment and effective use of his property.

198.    The Government, by destroying access to the Gold King Mine, and in locating the water treatment facility and operations on the Gladstone Property, has interfered with Plaintiff's mineral interests without due process and without just compensation.

199.    The Government, by locating and operating the water treatment facility on Plaintiff's property, has blocked his ability to access and mine for critical minerals on that property.

200.    Plaintiff is entitled to just compensation for the Government's physical taking of his Gladstone Property for public use.  Total compensable damages include the lost fair

market value of the entirety of the Gladstone Property, including the critical minerals found on such property, plus interest, as determined in accord with the substantial evidence of record and the law.

201.     The physical taking of Plaintiff's property is without Plaintiff's free and voluntary consent.  Plaintiff acquiesced to the Government's access to and activities on his property only under the coercive threat of CERCLA enforcement and substantial penalties and liabilities.  The Government's access, physical invasion and occupation, and use of his Gladstone Property at this point in time is pursuant to the January 2021 Modified Administrative Order.

202.     Defendant's activities on and physical invasion of the Gladstone property, the construction and operation of the water treatment plant and related infrastructure, the storage of waste resulting from such water treatment activities, and the long-term work on the property, have precluded and continue to preclude Plaintiff's use and enjoyment of the property for its highest and best use and have also negatively impacted the property, and created a stigma surrounding the property, so as to destroy or substantially diminish its market value.

203.     As a result of Defendant's access to, occupation of, and use of such property, Plaintiff has suffered and will continue to suffer substantial economic harm. Plaintiff has been precluded from moving forward with developing the property for its highest and best use, and alternative uses that would impart significant market value are currently untenable or unavailable.

204.     Defendant's physical invasion and occupation of the Gladstone Property has irretrievably interfered with Plaintiff's reasonable, investment-backed expectations that the property would be timely and economically developed.

205.     The Government's physical invasion and occupation of the Gladstone Property effect a *per se* taking of private property for public use, for which the Government has provided no compensation.  Such taking of private property for public use, without just compensation, violates the Fifth Amendment of the United States Constitution.

206.     Plaintiff demands full and just compensation for the damages caused by EPA's Gold King Mine release and all subsequent actions.  Despite repeated requests by Mr. Hennis, the Government has refused to step forward and take responsibility for the damages that he has suffered as a result of its actions, or to pay just compensation for the property that it has taken.

207.     Plaintiff is entitled to just compensation for the Government's physical taking of his Gladstone Property for public use, including both compensation for the specific areas of the property taken, as well as severance damages for those portions of the property negatively impacted as a direct result of the Government's taking.  Total compensable damages include the lost fair market value of the full property, plus interest, as determined in accord with substantial evidence of record and the law.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Todd Hennis prays for an order from this Court as follows:

1.  A judgment in Plaintiff's favor finding the United States Government liable for the temporary physical taking and damaging of the Gladstone Property.

2. *In the alternative:*  A judgment in Plaintiff's favor finding the United States Government liable for the permanent physical taking and damaging of the Gladstone Property.

3. A judgment in Plaintiff's favor awarding damages in an amount to be determined at trial, but no less than $ 792,000.00 to justly compensate him for the United States Government's damage to and physical invasion, occupation, use and taking of his property without paying the fair rental/lease value for each month that it has occupied and used said Gladstone Property from August 2015 until August 2021, as well as such additional monthly rental payments as are due for that period of time until the Government vacates said property.

4. A judgment in Plaintiff's favor awarding damages in an amount to be determined at trial, but no less than $ 3.0 million to justly compensate him for the United States Government's damage to and physical invasion, occupation, use and permanent taking of said Gladstone Property.

5. Interest on the damages determined to be just compensation based on the delay in the actual payment of just compensation, calculated from the date of the physical taking.

6. An award of reasonable attorney's fees, costs, and recoverable expenses.

7. Granting such further relief at law or in equity as this Court deems just under the circumstances.

Dated this 3rd day of August 2021.

Attorneys for Plaintiff

 /s/ *Harriet M. Hageman*
Harriet M. Hageman (Wyo. Bar #5-2656)
Senior Litigation Counsel
New Civil Liberties Alliance
1225 19th St., NW, Suite 450
Washington, DC 20036
Harriet.Hageman@NCLA.legal
Cell Number:          307-631-3476
Office Number:       202-869-5210