IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | | |
|---|---|---|---|
| TODD HENNIS, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | Case No. 21-1654L | |
| vs. | ) | | |
| | ) | | |
| THE UNITED STATES OF AMERICA, | ) | Senior Judge Mary Ellen Coster | |
| | ) | Williams | |
| Defendant. | ) | | |

---

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S
MOTION TO DISMISS**

---

/s/ *Harriet M. Hageman*
Harriet M. Hageman (Wyo. Bar #5-2656)
Senior Litigation Counsel
New Civil Liberties Alliance
1225 19th St., NW, Suite 450
Washington, DC 20036
Harriet.Hageman@NCLA.legal
Office Number:      202-869-5210

ORAL ARGUMENT IS REQUESTED

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

    I.    Background ........................................................................................................ 3

    II.    EPA's Breach of the Gold King Mine ............................................................. 4

    III.   Contamination, Physical Occupation, and Taking of Plaintiff's Property......... 9

    IV.  Development and Use Opportunities for Plaintiff's Property........................... 12

    V.    The Government Used Coercion to Gain Access to Plaintiff's Property .......... 13

    VI.  Plaintiff Is Entitled to Be Paid the Value of His Property ............................. 16

STANDARD OF REVIEW ............................................................................................. 17

LEGAL ANALYSIS ....................................................................................................... 18

    I.    The Government Has Taken Plaintiff's Real Property .................................... 18

    II.    Defendant's Arguments Are Without Merit ................................................... 22

        A.    The Doctrine of Necessity Does Not Apply Here ..................................... 22

        B.    Plaintiff Is Not Alleging That the Negligence of the EPA Contractor Gives Rise to a Takings Claim....................................................................................................... 30

        C.    Plaintiff Did Not Voluntarily Consent to Defendant's Use of His Property ............. 34

        D.    The Compensation to Which Plaintiff Is Entitled Is a Question of Fact for Trial...... 40

CONCLUSION................................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Ark. Game and Fish Comm'n*, 568 U.S. 23 (2012)...................................................... 32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 17

*Bauman v. Ross*, 167 U.S. 548 (1897) ......................................................................... 40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................. 17

*Briseno v. United States*, 83 Fed. Cl. 630 (Ct. Cl. 2008) ....................................... 17, 23

*Cary v. United States*, 552 F. 3d 1373 (Fed. Cir. 2009) .............................................. 30

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) ............................................. 18

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ........................................................... 22

*FCC v. Fla. Power Corp.*, 480 U.S. 245 (1987) .......................................................... 22

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*,
   482 U. S. 304 (1987) ................................................................................................ 20

*Horne v. Dep't of Agric.*, 576 U.S. 350 (2015).......................................................... 21

*Jacobs v. United States*, 290 U.S. 13 (1933) ............................................................. 20

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979).................................................. 22

*Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019)................................................... passim

*Lingle v. Chevron*, 544 U.S. 528 (2005) ............................................................... 21, 22

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).......... 19, 21, 22, 28

*Lucas v. S. C. Coastal Council*, 505 U.S. 1003 (1992)....................................... 19, 27, 28

*Miller v. Schoene*, 276 U.S. 272 (1928) ...................................................................... 27

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ................................................................ 19

*Nat'l Bd. of the YMCA v. United States*, 396 F. 2d 467 (Ct. Cl. 1968) ........................ 36

*Nat'l Bd. of YMCA v. United States*, 395 U.S. 85 (1969) ...................................... 28, 36

*Neitzke v. Williams*, 490 U.S. 319 (1989) .................................................................. 34

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) ............................................... 22

*Olson v. United States*, 292 U.S. 246 (1934) .............................................................. 22

*Pumpelly v. Green Bay Co.*, 13 Wall. 166, 20 L.Ed. 557 (1872) ................................. 32

*Ridge Line, Inc., v. United States*, 346 F. 3d 1346 (Fed. Cir. 2003)....................... 33, 34

*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002).......... 19

*Trin-Co Inv. Co. v. United States*, 130 Fed. Cl. 592 (Ct. Cl. 2017)............................... 23, 26, 27

*Trin-Co Inv. Co. v. United States*, 722 F.3d 1375 (Fed. Cir. 2013)............................... 26

*United Communities, LLC v. United States*, 154 Fed. Cl. 676 (Ct. Cl. 2021) ................. 34

*United States v. 564.54 Acres of Land, More or Less*, 441 U.S. 506 (1979)............... 22

*United States v. Causby*, 328 U.S. 256 (1946)........................................................... 18

*United States v. Dow*, 357 U.S. 17 (1958) ................................................................. 18

*United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945) ......................................... 21

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951)............................................... 21

*Waverly View Investors, LLC v. United States*, 135 Fed. Cl. 750 (Ct. Cl. 2018) ....... 37, 38, 39, 40

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980)....................... 19

*Yee v. City of Escondido*, 503 U.S. 519 (1992)........................................................... 22

ii

**Constitutional Provisions**

U.S. Const. amend. V..................................................................................................... 18, 19

**Statutes**

28 U.S.C. § 1491(a)(1)..................................................................................................... 18
42 U.S.C. § 4651 ......................................................................................................... 16, 38
42 U.S.C. § 9604I(5)..................................................................................................... 14, 15

**Rules and Regulations**

40 CFR § 300.400(d)(4)..................................................................................................... 14
RCFC 12(b)(6) ......................................................................................................... 17, 34
RCFC 8 ......................................................................................................................... 17

## INTRODUCTION

On August 5, 2015, the Environmental Protection Agency ("EPA") destroyed the portal to the Gold King Mine located on the slope of Bonita Peak in San Juan County in southwestern Colorado.  Upon doing so, EPA released a toxic sludge of over 3,000,000 gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River watershed.  The massive sickly orange contaminated plume of water cascaded down the embankment outside the Gold King Mine, rushed down the mountainside, and quickly overwhelmed Cement Creek, a tributary to the Animas River. This plume of contamination—referred to as the "orange (or yellow) river seen around the world"—snaked down the River through Colorado, into New Mexico, through the Navajo Nation and into Utah, reaching Lake Powell hundreds of miles downstream a week later.

Plaintiff Todd Hennis ("Hennis"), through the San Juan Corporation, owns the Gold King Mine.  EPA never informed him of the specific work that it intended to do on his property on August 5, 2015, or its intent to destroy the Gold King Mine portal. EPA was entirely unprepared to either contain or deal with the environmental disaster that it created and it did not prevent or control the contaminated flows that gushed out once it breached the Mine portal.  The EPA eventually mobilized supplies and equipment on the "Gladstone Property," (located below the Mine and also owned by Plaintiff), to address the immediate after-effects of its actions.

Although Mr. Hennis gave EPA permission to temporarily use a portion of the Gladstone Property, he also instructed that it was not allowed or authorized to use the "Herbert Placer" lands for water treatment.  EPA ignored his instructions, however, and eventually constructed a multi-million-dollar water treatment plant on Plaintiff's Herbert Placer property.  The United States Government ("Government" or "Defendant") has never paid Hennis *any* compensation for the flooding and use of his property; it has instead been squatting on his lands for over six years.

1

On August 3, 2021, Plaintiff filed a lawsuit against the Defendant asserting two causes of action: (1) for the temporary physical taking of his property without just compensation; and, (2) *in the alternative* for the permanent physical taking of his property without just compensation.  Both claims are based upon EPA's physical invasion, occupation and taking of Plaintiff's property, by flooding it with contaminated water and through the construction and operation of the water treatment plant and related infrastructure.

It is undisputed that Defendant has taken Plaintiff's real property.  It is equally undisputed that Defendant has failed to pay Plaintiff just compensation for such taking.  Despite these facts—which must be taken as true at this stage of the proceedings—Defendant now claims that it was "necessary" to construct a water treatment plant on Plaintiff's property to address the "emergency" it created when the EPA breached the Gold King Mine.  Defendant also seeks to inoculate itself from liability by arguing that it cannot be held liable for its "contractor's" negligence in breaching the portal.  Defendant further claims that Plaintiff gave "permission" for it to construct the water treatment facility on his property.  Defendant's final argument is that Plaintiff is not entitled to compensation for "consequential losses," including lost business opportunities.

There are numerous flaws in Defendant's arguments.  First, the water treatment plant was not constructed to capture and treat the 3,000,000 gallons of acid mine drainage or the 880,000 pounds of heavy metals that were released upon the collapse of the Mine portal; it was constructed to treat ongoing seepage from the Gold King Mine that resulted from the EPA's breach.  Second, EPA controlled every single aspect of the August 5, 2015 work that resulted in the destruction of the Gold King Mine portal and release of the contaminants, and its effort to deflect blame to the contractor has no factual or legal support.  Third, Plaintiff did not voluntarily give EPA permission to construct and operate a water treatment facility on his property. In fact, EPA built the facility

without his knowledge or consent, and later coerced Mr. Hennis into not objecting by threatening him with extortionate fines should he exercise his property rights. Mr. Hennis eventually refused to sign an access document, and the Government is currently occupying his property by operation of an administrative order. Finally, the scope and amount of Plaintiff's damages and just compensation are a matter for trial, and cannot be decided on a motion to dismiss.

Defendant's Motion to Dismiss should be denied. The Government must be held to account for invading and taking Plaintiff's real property.

## STATEMENT OF FACTS

Plaintiff Hennis is a citizen of the State of Colorado and is the current owner of the real property at issue here. *ECF No. 1 at ¶ 1.* The Government, by and through EPA, caused the environmental catastrophe that preceded the invasion, occupation, taking, and confiscation of Hennis's property. *Id. at ¶ 2.* The Government has violated the Fifth Amendment to the United States Constitution by refusing to pay Plaintiff just compensation for the taking of his property. *Id. at ¶ 3.* Plaintiff is seeking a minimum of $3,792,000 plus interest against Defendant for the damages to and physical taking of his property. *Id. at ¶ 4.*

### I.   BACKGROUND

The headwaters of the Animas River begin in the San Juan Mountains of southwestern Colorado. *Id. at ¶ 12.* The confluence of streams—Mineral Creek, Cement Creek, and the Upper Animas—define the Upper Animas River Basin. *Id.* The river Basin contains hundreds of inactive or abandoned mines, including the Gold King Mine located on the slope of Bonita Peak. *Id.* The Gold King Mine contains numerous workings on seven levels ranging from 11,440 feet to 12,300 feet above sea level. *Id. at ¶ 13.* The American Tunnel is the lowest transportation and ore-haulage level of the Gold King Mine and the adjacent Sunnyside Mine. *Id. at ¶ 14.*

3

In 1988 Sunnyside Gold Corporation ("Sunnyside Gold") (the owner of the neighboring Sunnyside Mine) overhauled and upgraded an existing water treatment facility at the historic town of Gladstone, the purpose of which was to receive and treat the acid mine drainage from the American Tunnel. *Id.* at ¶ 15. Sunnyside Gold operated the Treatment Facility on the Gladstone Property to capture and treat the discharges from the American Tunnel in compliance with federal Clean Water Act regulations and Colorado-issued discharge permits. *Id.* at ¶ 16. Based upon a Consent Decree entered into with the Colorado Water Quality Control Division ("WQCD"), Sunnyside Gold discontinued using the Gladstone Treatment Facility in 2005. *Id.*

Plaintiff Hennis acquired the Gold King Mine and the Gladstone Property in 2005. *Id.* at ¶ 18. The Gladstone Property is made up of three mining claims: (1) the Herbert Placer (M.S. #13562); (2) the Anglo Saxon (M.S. #14875); and (3) the Harrison Millsite (M.S. #14710). *Id.* The Gladstone Property consists of roughly 33.4 acres of land. *Id.*

The Gladstone Property has historically been used for a variety of purposes, including water treatment, light and heavy industrial activities, storage of industrial equipment, as a staging area for access to and operation of surrounding mines, high density town site (the historical Town of Gladstone), and other large-scale activities. *Id.* at ¶ 19. Plaintiff has spent substantial funds improving the Gladstone property since he acquired it. *Id.* at ¶ 20.

## II.    EPA'S BREACH OF THE GOLD KING MINE

On August 5, 2015, EPA's contractor, Environmental Restoration, LLC ("Environmental Restoration"), as directed and supervised by EPA and the Colorado Division of Reclamation, Mining and Safety ("DRMS"), used an excavator to dig away tons of rock and debris that sealed the portal of the Gold King Mine. *Id.* at ¶ 21. Upon breaching the collapsed portal, the EPA and Environmental Restoration released a toxic sludge of over 3,000,000 gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River watershed. *Id.*

4

Water had been accumulating in and seeping from the Gold King Mine portal for years. *Id.* at ¶ 22.  EPA knew that the Gold King Mine was filled with water, as both Colorado's records and EPA's own work plan highlighted the risk of a significant blowout if it attempted to dig away the blockage.  *Id.*   EPA not only knew of the water buildup, but it was also aware such water was highly acidic and laced with heavy metals.  *Id.* at ¶ 23.  EPA officials knew of the blowout risk associated with breaching the Gold King Mine portal.  *Id.* at ¶ 24.

EPA had initially gained access to the Gold King Mine in 2008 through an agreement with Plaintiff and San Juan Corporation (controlled by Hennis).  *Id.* at ¶ 25. That agreement allowed EPA, the Bureau of Land Management ("BLM"), and DRMS to enter the Gold King Mine site and other properties owned by Plaintiff *for the purpose of monitoring* the integrity of the Mine.  *Id.* When EPA sought to renew the agreement in late 2010, however, Plaintiff refused based on his concern that EPA would create a "pollution disaster."  *Id.* at ¶ 25.  EPA responded to Plaintiff's legitimate concerns on May 12, 2011, by serving him with an "Administrative Order Directing Compliance with Request for Access" ("2011 Administrative Order") and threatened him with fines upwards of $37,500 *per day* if he refused. *Id.* at ¶ 26. Considering EPA's threats, Plaintiff had no choice but to accede to its demands.  *Id.*   Plaintiff and EPA extended the access several more times, including on August 8, 2014, which lasted through the end of 2015.  *Id.*   Plaintiff's agreement to such extensions was based on the Government's threat to pursue fines of up to $37,500 *per day* against him if he did not give such access.  *Id.*   Importantly, the scope of the Government's access to Plaintiff's property pursuant to the 2011 Administrative Order did not include the construction or operation of a treatment plant on the Gladstone Property.  *Id.* at ¶ 27.

EPA had considered drilling into the Gold King Mine from above to directly measure the water level before beginning any excavation work at the entrance, as was done at nearby mines in

2011.  *Id.* at ¶ 28.  A hydraulic pressure test would have confirmed that it was unsafe to remove the backfill (sealing the portal) and that EPA needed to take additional precautions to prevent its "excavation-induced failure."  *Id.*  Had EPA simply followed this common practice it would have discovered that the Gold King Mine contained a vast quantity of highly pressurized water.  *Id.*  If EPA had pursued this standard approach, it would have identified the water level and pressure in the mine and changed its course of action, thereby preventing an avoidable disaster.  *Id.*

Steven Way, EPA's On-Scene Coordinator and lead official at the Gold King Mine, had instructed the EPA and DRMS employees, as well as EPA's contractor (Environmental Restoration), *not* to excavate the earthen debris blocking the portal and *not* to drain the mine without first setting up the equipment necessary to handle the discharge.  *Id.* at ¶ 29.  Mr. Way understood the hazards at the site and told the crew to wait to excavate until after he had returned from vacation and consulted with an engineer from the Bureau of Reclamation ("USBR") about the risks of EPA's actions at the site.  *Id.* at ¶ 30.  The USBR's engineer was scheduled to conduct an on-site review of the plan of action for the Gold King Mine on August 14, 2015.  *Id.*

Hays Griswold was the EPA official in charge of the Gold King Mine while Mr. Way was absent.  *Id.* at ¶ 31.  Griswold was acting within the scope of his employment as the official in charge of the Gold King Mine.  *Id.*  He arrived at the Gold King Mine work site on the morning of August 4, 2015.  *Id.* at ¶ 33. With an incomplete safety plan, an inadequate site evaluation, and lacking the necessary equipment, the EPA crew began digging at the adit[1] around mid-morning. *Id.* By the end of the day the crew had excavated all but a small portion of a drainage pipe installed

---

[1] An "adit" is the entrance to an underground mine which is horizontal (or nearly horizontal) by which the mine is to be entered, drained of water, ventilated, and for the removal of minerals.  *Id.* at 7 n. 1.

in 2009.  *Id.*  Photographs of the adit show what appears to be wooden debris from the portal structure embedded in the earthen plug that held back the water in the Mine. *Id.* at ¶ 33.

The following day, on August 5, 2015, more personnel from DRMS joined the EPA crew at the Level 7 adit to continue excavating.  *Id.* at ¶ 34.  That morning EPA excavated and removed the last remnants of the DRMS-installed pipes.  *Id.*  The EPA crew knew or should have known that they were removing material at least several feet below the roof of the adit.  *Id.*  The EPA crew next backfilled the excavated area in front of the plug and built an earthen berm.  *Id.* at ¶ 35.  Having decided to drain the Mine—without testing the pressure, without having an adequate safety plan in place, and without receiving USBR's input and advice—the crew dug a channel on the right side of the berm and positioned planks so that water flowing from the adit could be directed to the drainage channel that DRMS had installed.  *Id.*  The EPA crew resumed digging at the mouth of the adit, when the operator soon reported hitting a "spring."  *Id.* at ¶ 36.  The EPA crew neither attempted to backfill the adit, plug the "spring," nor otherwise stop the water from flowing out of the Mine.  *Id.*  Within minutes, the "spring" started spurting and the flow surged, culminating in the massive blowout of the Gold King Mine.  *Id.*  It was ultimately found that the work crew had not hit a "spring" at all, but instead had breached the Gold King Mine portal and begun releasing over 3,000,000 gallons of acid mine drainage and sludge, and 880,000 pounds of metals.  *Id.*

Photographs of EPA's work site show that Griswold did not follow Way's instructions nor the contractor's existing work plan. *Id.* at ¶ 37.  For example, the EPA crew, under Griswold's direction, excavated toward the adit floor at the level of the earlier-installed drainage pipes. *Id.* Way had instructed the work-crew that it was necessary to have a pump, hose, and stinger pipe on hand before removing *any* material at the level of the two pipes.  *Id.* at ¶ 37.  The photographs confirm that the excavation team was excavating at the level of the drainage pipes, toward the adit

floor, without a pump, hose, or stinger on hand. *Id.* at ¶ 38. The combination of EPA's decision not to test for hydrostatic pressure, and Griswold's failure to follow Way's directions, was a recipe for disaster. *Id.* at ¶ 39. Contrary to Way's instructions, Griswold had the work crew dig directly toward the earthen material holding back millions of gallons of acid mine drainage and waste. *Id.*

Griswold has admitted that he and other EPA personnel knew the blockage could be "holding back a lot of water," and that others in the group also had such knowledge. *Id.* at ¶ 40. The EPA thus understood the hazards of breaching the collapsed portal of the Gold King Mine prior to commencing the work on August 5, 2015. *Id.* at ¶¶ 40-41.

EPA was unprepared for the consequences of breaching the Gold King Mine, failed to mobilize the necessary equipment to contain the water and heavy metals that it knew were on site, and failed to construct an adequate embankment, berm, dam or other structure to contain the water and sludge released from the Mine. *Id.* at ¶¶ 42-44. EPA failed to plan or prepare for handling and treating the acid mine drainage and heavy metals released from the Mine. *Id.* at ¶ 45. EPA, as the very agency entrusted to protect the environment, violated its own directives, protocols and procedures, while also ignoring the well-understood risk of undertaking this operation, thereby triggering a massive release of pollutants onto the Plaintiff's private property below the Gold King Mine and into the waterways downstream. *Id.* at ¶ 46. EPA's conduct was reckless, deliberately indifferent, and outrageous; it knew of and nevertheless disregarded the substantial risk of serious harm to Plaintiff and his property rights. *Id.* at ¶ 47.

EPA's breach of the portal released a massive sickly yellow/orange plume of contaminated water from the Gold King Mine, including the release of numerous heavy metals such as lead, cadmium, copper, mercury, arsenic, beryllium, zinc, selenium, and iron. *Id.* at ¶ 49. The water carrying these heavy metals first flooded across Plaintiff's real property and into Cement Creek

for its journey downstream. *Id.*  To make matters worse, EPA employees responsible for breaching the Gold King Mine waited an hour to notify their supervisors after the blowout occurred.  *Id.* at ¶ 50.  EPA did not issue a press release until around midnight that day, and it did not notify residents until 24 hours after it occurred.  *Id.*  EPA waited an entire day before informing downstream mayors, health officials, families, farmers, ranchers, fishermen, and recreationists that the water they were using, drinking, and irrigating with, was contaminated. *Id.*  On August 8, 2015, the then-Governor of Colorado, John Hickenlooper, declared the affected area a disaster zone.  *Id.* at ¶ 51.

It is irrefutable that EPA was the cause and culprit of the Gold King Mine blowout, a fact that it has repeatedly admitted since that tragic day.  *Id.* at ¶ 52.  EPA is an agency and instrumentality of the United States Government.  *Id.* at ¶ 53.  It is thus irrefutable that the United States is responsible for all of the damages, injury, loss of revenue, and consequences of breaching the Gold King Mine, and for ensuring that anyone affected by this disaster, including Plaintiff Hennis whose property was taken by the United States to respond, is properly, fairly and adequately compensated and made whole.  *Id.* at ¶ 54.

## III.   CONTAMINATION, PHYSICAL OCCUPATION, AND TAKING OF PLAINTIFF'S PROPERTY

Shortly after EPA's blow-out of the Gold King Mine, Mr. Hennis verbally authorized the Government to temporarily use *a specific and identified portion* of the Gladstone Property for an emergency staging area for equipment and supplies, recognizing that time was of the essence to address the environmental catastrophe.  *Id.* at ¶ 55.  Mr. Hennis, however, *did not* grant to EPA the permission to construct a water treatment facility on his property.[2]  *Id.*  The Government has never paid any consideration for the temporary use of Plaintiff's property as a staging area.  *Id.*

---

[2] The United States claims that "… EPA and Plaintiff reached an oral agreement that permitted EPA to construct and operate a water treatment plant on the Gladstone parcel." ECF No. 7 at 1. That claim is untrue, and directly refuted in Plaintiff's Complaint which, at this stage of these proceedings, must be taken as true. *See* ECF No. 1 at ¶¶ 55-58.

Plaintiff did not give EPA permission to occupy and use his property indefinitely.  *Id.* at ¶ 56.  Hennis instead *specifically instructed* EPA that he was not authorizing the agency to use the Herbert Placer portion of the Gladstone Property for water treatment. *Id.* at ¶ 57.  Plaintiff allowed EPA to temporarily use *a portion* of his property with the understanding that since EPA had admittedly caused the environmental catastrophe, and was responsible for all the related damages, the Government would negotiate in good faith to enter into a lease or other rental agreement to pay just compensation for the use of his property.  *Id.* at ¶ 58.  .

EPA ignored Hennis's instructions regarding the scope of access to his property and constructed a $ 2.3 million water treatment facility *on the Herbert Placer portion of the Gladstone Property*, later asserting that such location was "optimal for the treatment facility."  *Id.* at ¶¶ 55-58.  EPA completed construction of this facility in November 2015 (three months after *the crisis* had ended) to treat water that continues to seep from the Gold King Mine.  *Id.* at ¶ 59.

Defendant is intentionally vague in its Motion on whether there was an "emergency" "necessitating" it to take Plaintiff's property to construct the water treatment plant. The Government is attempting to lead this Court to believe that Plaintiff's property was the *only* land in the area on which such facility could be built. That, however, is not the case. In fact, EPA's sister agency, the BLM, owns federal lands adjacent to Plaintiff's property.  *Id.* at ¶ 60. EPA thus very well *could have* constructed its treatment plant on federal lands; it just chose not to do so.  *Id.*

EPA concluded that the Gladstone Property was a "prime location" and optimum property to construct and operated its water treatment facility.  *Id.* at ¶ 62. EPA based its decision on the historical use of this area for water treatment purposes, the existence of other water treatment activities in the vicinity, the flat terrain, the availability of a well-maintained road to this property, the proximity to the Gold King Mine and the American Tunnel, and the existing infrastructure.  *Id.*

EPA constructed a series of settling ponds on Plaintiff's property to retain and treat the water flowing from the Gold King Mine. *Id.* at ¶ 63. EPA also installed piping and surge protection and constructed a water conveyance system from the portal to the water treatment plant that it constructed at the location of a former water treatment facility on Plaintiff's Gladstone Property. *Id.* EPA knew at the time that it took the Hennis property that this area had been historically used for industrial operations and activities. *Id.* at ¶ 64.

EPA has operated its water treatment facility on Plaintiff's property since November 2015. *Id.* at ¶ 66. EPA's water treatment process involves running the water from the Gold King Mine into the treatment plant via pipeline(s). *Id.* at ¶ 67. The untreated water is piped into large tanks where an additive is mixed in to bind with the contaminants, sludge, and minerals, which then drop to the bottom of large tanks. *Id.* The contaminants and other solid materials are pushed into large porous bags, where the waste continues to dry. *Id.* The solid waste is eventually spread across a large area on Mr. Hennis's property for further drying. *Id.* EPA's water treatment operations involve the storage of mine waste, solids, and other contaminants on Plaintiff's real property. *Id.* at ¶ 68. EPA has not informed Plaintiff of what it intends to do with this waste in the long term nor how it intends to restore his property to its prior, uncontaminated condition. *Id.*

EPA has continuously expanded its physical "footprint" on Plaintiff's property, with such expansion being related to storing the contaminants/sludge/waste byproduct. *Id.* at ¶ 69. EPA has operated its treatment plant on Plaintiff's property for over five years and has variously indicated that it intends to continue to operate the facility for an additional five, seven or eight more years. *Id.* at ¶ 70. The Government has incurred well over $44,500,000 in past response costs related to its destruction of the Gold King Mine portal. *Id.* at ¶ 71. It estimates an additional $20.7 million

in future response costs at this site.  *Id.*  None of these costs, however, include compensating Plaintiff for the ongoing invasion, occupancy, use and physical taking of his property.  *Id.*

IV.   **DEVELOPMENT AND USE OPPORTUNITIES FOR PLAINTIFF'S PROPERTY**

Plaintiff's property is located next to the Silverton Mountain Ski Area, is the only developable land within the vicinity, and is worth a substantial amount of money.  *Id.* at ¶ 72. Plaintiff has had and continues to have discussions with developers regarding developing his Gladstone Property into a resort area to serve the Silverton Mountain Ski Area.  *Id.* at ¶ 73.  EPA's operation of its water treatment facility on his property has prevented him from pursuing such development opportunities/plans.  *Id.*  Plaintiff has had other development opportunities as well. *Id.* at ¶ 74.  Defendant's open-ended occupation and use of Plaintiff's Gladstone Property has obstructed his plans, and interferes with his use and enjoyment of said property for the foreseeable future.  *Id.* at ¶¶ 75, 76.  So long as Defendant operates the water treatment facility, to store the waste from such operations, to conduct other investigative and remedial activities, and to otherwise access and occupy Plaintiff's property, Plaintiff is immobilized from taking any substantial steps toward development of it.  *Id.* at ¶ 77.  As a practical matter, no such development or use can occur because Plaintiff is precluded from interfering with Defendant's operations on the property.  *Id.*

Defendant's activities on the Gladstone Property, including breaching the Gold King Mine in the first place, the flooding of the property, the construction and operation of the water treatment facility, and the use of such property to store waste, have negatively affected the property, created a stigma surrounding it, and diminished its economic and market value.  *Id.* at ¶ 78.  The EPA-caused Gold King Mine disaster received substantial publicity throughout the country and world. Plaintiff's property was "ground zero" of this catastrophe and continues to be publicly tied to the ongoing effort to clean up the environmental mess that EPA created.  *Id.*

## V.   THE GOVERNMENT USED COERCION TO GAIN ACCESS TO PLAINTIFF'S PROPERTY

Defendant physically invaded, seized, and occupied Hennis's real property in violation of his basic constitutional rights. *Id.* at ¶ 90. EPA first demanded Plaintiff to sign an access document for the Gladstone Property in November 2015 (*after* the agency had already constructed the water treatment facility). *Id.* at ¶ 91; ECF No. 7-1. Plaintiff requested EPA pay compensation to use his property. *Id.* EPA understood that Plaintiff had not "voluntarily" agreed to sign an access agreement (noting that "Mr. Hennis declined to extend access beyond December 31, 2015…") and threatened legal action against him: "**If the EPA does not hear from Mr. Hennis within 7 days of receipt of this letter, the EPA will consider that a denial of this request for access and the EPA will seek to gain access using its legal authorities.**" *Id.* at 2 (bold in original). It is important to note that the Government's November 10th letter intentionally misrepresented its authority to construct and operate a water treatment facility on Plaintiff's property, claiming that a previous document that he had signed provided such authority. *Id.* That document, however, did not cover the Gladstone Property and did not allow for the construction and operation of a water treatment facility. The Government's misrepresentations in that regard were designed to coerce Plaintiff into granting access to his property. ECF No. 1 at ¶¶ 91-93.

EPA's threats had their intended effect, with Plaintiff signing the "Consent for Access to Property" on November 20, 2015. *Id.* at ¶ 94; ECF No. 7-2. By its terms, that Consent expired on the last day of March 2016. *Id.* EPA coerced Plaintiff into signing a series of such documents in the ensuing 5+ years, each of which had an expiration date of approximately six months to one year later. *Id.* EPA's use of Plaintiff's property was thus time limited. Plaintiff did not participate in drafting these documents. *Id.* The Government instead periodically demanded that he sign them, with the "*or else*" being clear in EPA's correspondence. *Id.* Plaintiff involuntarily accepted the Government's terms for access to and occupation of the Gladstone Property. *Id.* at ¶ 95. Plaintiff

had no alternative, with the circumstances having been created by EPA's breach of the Gold King Mine, its decision to take Plaintiff's property, and its coercion of Plaintiff into providing access by threatening to fine him if he refused. *Id.* The Government has never paid any consideration in exchange for Plaintiff signing these documents. *Id.* at ¶ 96.

In April 2020, EPA again demanded that Plaintiff sign a "Consent for Access to Property" for that period up through December 31, 2020. *Id.* at ¶ 97. Plaintiff signed that document on April 16, 2020. It expired over a year ago. EPA continues to occupy and control his property. *Id.*

EPA did not include a waiver of rights in the "consent for access" documents that it coerced Plaintiff into signing. *Id.* at ¶ 98. Plaintiff, in other words, has never waived his right to seek compensation from the Government for a temporary or permanent taking of his property by providing the EPA with access. *Id.* EPA has acknowledged Plaintiff's repeated demands that the Government compensate him for using and physically taking his property. *Id.*

In November 2020, EPA demanded that Plaintiff sign an eight-year "Consent for Access to Property," to cover that period up to and including December 31, 2028. *Id.* at ¶ 99. Plaintiff refused, instead agreeing to extend access only up to February 28, 2021, in the hopes that EPA would finally negotiate in good faith to pay for the past and future use of his property. *Id.* EPA responded on January 6, 2021 by making good on its threats and serving Plaintiff with an "Administrative Order Directing Compliance with Request for Access" pursuant to "the authority vested in the President of the United States by Section 104I(5) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. § 9604I(5), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR § 300.400(d)(4)" ("January 6, 2021 Administrative Order"). *Id.* The January 6, 2021 Administrative Order required Plaintiff to grant EPA "entry and access" to the Gladstone Property,

and to "refrain from interfering with access to the Gladstone Property or with other activities conducted within the scope of this Order…." *Id.* at ¶ 100. It also required Plaintiff to provide access to and use of his property or face a civil enforcement proceeding pursuant to CERCLA (42 U.S.C. § 9604I(5)) through which EPA would seek penalties of $59,017 *per day* for any period of time during which EPA concluded that he is not in compliance. *Id.*  Plaintiff responded to EPA by pointing out that he had never blocked access to the Gladstone Property, but had consistently demanded that the Defendant pay just compensation for taking his property.  *Id.* at ¶ 101.

On January 27, 2021, EPA issued a "Modified Administrative Order Directing Compliance with Request for Access ("Modified Administrative Order").  *Id.* at ¶ 102.  One primary difference between the January 6, 2021 Administrative Order and the Modified Administrative Order is that EPA dropped its demand that Plaintiff *affirmatively state* his intent to comply by agreeing to allow ongoing access.  *Id.*  EPA also confirmed that Plaintiff had not waived his right to pursue a taking claim against Defendant: "Nothing in this Order constitutes a waiver, bar, release, or satisfaction of or a defense to any cause of action which Respondent has now or may have in the future against EPA, the United States, or against any entity which is not a party to this Order."  *Id.*  The Modified Order remains in effect until the earliest of three events: (1) Plaintiff signs a five-year consent; (2) Plaintiff enters into a lease agreement for the Gladstone Property; or (3) December 31, 2025.  *Id.*

Plaintiff did not freely sign the EPA's "Consent for Access to Property" documents, but was instead coerced to do so by the Government beginning in 2011 (with EPA back then threatening fines of $37,500 *per day* unless he provided access to the Gold King Mine and other lands). *Id.* at ¶¶ 103-104.  The Government is currently occupying Plaintiff's property pursuant to the January 2021 Modified Administrative Order has now threatened penalties of $59,017 *per day* should he deny access.  *Id.* at ¶ 103. Plaintiff did not voluntarily accept the Government's terms

for the "Consent for Access to Property" documents.  Plaintiff had no choice, a situation created by the Government's coercion. *Id.* at ¶ 104.  Plaintiff has repeatedly communicated with the EPA and demanded just compensation for his property.  *Id.* at ¶ 105.  Plaintiff did not consent to the Government's occupation, use and taking of his property without just compensation.  *Id.* at ¶ 107.  The Government's presence and activities on Plaintiff's property confer no special benefit on Plaintiff; the Government is responsible for the contamination of his property, and for addressing the environmental catastrophe that EPA created.  *Id.* at ¶ 108.

The Government had and continues to have an obligation to negotiate with Plaintiff in good faith regarding the terms and conditions for physically occupying, using and taking his property.  *Id.* at ¶ 109. *See also* 42 U.S.C. § 4651 (discussed in greater detail below). The Government has refused to negotiate with Mr. Hennis in good faith or treat him fairly, rejecting his demand to pay the fair market value for taking his property.  *Id.* at ¶ 110.  The Government has refused to make monthly rental or lease payments for the past occupation and use of the Gladstone Property from August 5, 2015, to the current date.  *Id.* at ¶ 111.  The Government has been physically squatting on Plaintiff's property for over five years, refused to pay rent, and rejected Plaintiff's demand to pay fair rental value and/or fair market value for the occupation, use and taking of his property since August 2015.  *Id.* ¶¶ 112-113.

## VI.   PLAINTIFF IS ENTITLED TO BE PAID THE VALUE OF HIS PROPERTY

The Gladstone Property was inspected by qualified real estate appraiser Robert Stevens, MAI, SRA, on May 28, 2020, and June 19, 2021.  *Id.* at ¶ 114.  Mr. Stevens has appraised Plaintiff's Gladstone Property as having a Fair Rental/Lease Market Value of at least $11,000 per month for that period of time from August 5, 2015 up to and including the date on which the Government pays for the invasion, occupation, use and taking of Plaintiff's property.  *Id.* at ¶ 115.  Such value as of August 3, 2021 is no less than $792,000.00.  *Id.*  Mr. Stevens has appraised

Plaintiff's Gladstone Property as having a Fair Market Value of at least $ 2.2 million dollars as of August 5, 2015.  *Id.* at ¶ 116.  Mr. Stevens has appraised Plaintiff's Gladstone Property as having a Fair Market Value of at least $ 3.0 million dollars as of January 6, 2021.  *Id.* at ¶ 117.  The foregoing Fair Rental/Lease Market Values and Fair Market Values do not include interest due from the Government to Plaintiff.  *Id.* at ¶ 118.

## STANDARD OF REVIEW

According to RCFC 8, a pleading that states a claim for relief must contain: "(1) a short and plain statement of the grounds for the court's jurisdiction…; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."  RCFC 12(b)(6) provides for dismissal of a complaint that fails "to state a claim upon which relief can be granted…."

> It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." …. When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader."  …. The court must inquire whether the complaint meets the "plausibility standard" recently described by the United States Supreme Court, *i.e.,* whether it adequately states a claim and provides a "showing [of] any set of facts consistent with the allegations in the complaint." ....

*Briseno v. United States*, 83 Fed. Cl. 630, 632 (Ct. Cl. 2008) (internal citations omitted).

After reviewing the Complaint and drawing all inferences in Plaintiff's favor, the Court may dismiss *only if* he has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face. A complaint will survive a motion to dismiss if it contains sufficient factual matter to state a claim for relief that is plausible on its face and provides more than labels and conclusions or a formulaic recitation of the elements of a cause of action.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff is not required to show a probability of success, but simply "more than a mere possibility that a defendant has acted unlawfully." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The United States Court of Federal Claims has jurisdiction under the Tucker Act to adjudicate any claim against the United States founded upon the Constitution.

> We have long recognized that property owners may bring Fifth Amendment claims against the Federal Government as soon as their property has been taken. The Tucker Act, which provides the standard procedure for bringing such claims, gives the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution" or any federal law or contract for damages "in cases not sounding in tort."

*Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019) (quoting 28 U.S.C. § 1491(a)(1)). "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." *United States v. Causby*, 328 U.S. 256, 267 (1946); *see also Knick*, 139 S. Ct. at 2170 (same). As the Court has explained, "'the act of taking' is the event which gives rise to the claim for compensation.'" *Knick*, 139 S. Ct. at 2170 (citing *United States v. Dow*, 357 U.S. 17, 22 (1958)).

## LEGAL ANALYSIS

**I. THE GOVERNMENT HAS TAKEN PLAINTIFF'S REAL PROPERTY**

Plaintiff Hennis brought this lawsuit challenging the Government's violation of the Fifth Amendment to the United States Constitution, which provides in relevant part that "nor shall any person … be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. Plaintiff seeks just compensation for the Government's temporary (past and future rental/lease payments), as well as the permanent physical taking of his property for public use and interest related thereto, along with an award of the costs, expenses and attorney's fees incurred in bringing this action.

"The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom. As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'" *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). "The

historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it. Such an appropriation is perhaps the most serious form of invasion of an owner's property interests." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). "[A] state, by *ipse dixit*, may not transform private property into public property without compensation…." *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1031 (1992) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980)). The government's physical takings of property represent a greater affront to individual property rights. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002). When the government physically takes property "it has a categorical duty to compensate the former owner … regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Id*. at 322.

"The plain language of the Takings Clause 'requires the payment of compensation whenever the government acquires private property for a public purpose….'[.]" *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) (quoting *Tahoe-Sierra Pres. Council*, 535 U.S. at 321). "Property rights are necessary to preserve freedom, for property ownership empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Id*. at 1943. The Takings Clause "prevent[s] the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id*. (internal citations and quotations omitted). The Takings Clause places a condition on the government's power to interfere with property rights, instructing that "private property [shall not] be taken for public use, without just compensation." *Id*. (quoting U.S. Const. amend. V).

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick,* 139 S. Ct. at 2167. "We have held that if there

is a taking, the claim is founded upon the Constitution and within the jurisdiction of the Court of

Claims to hear and determine. … And we have explained that the act of taking is the event which

gives rise to the claim for compensation." *Id*. at 2170. (internal citations and quotation marks

omitted). "The Fifth Amendment right to full compensation arises at the time of the taking,

regardless of post-taking remedies that may be available to the property owner." *Id*.

> That principle was confirmed in *Jacobs v. United States*, 290 U.S. 13, 54 S. Ct. 26, 78 L.Ed.142 (1933), where we held that a property owner found to have a valid takings claim is entitled to compensation as if it had been "paid contemporaneously with the taking"—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time.

*Id*.

> *Jacobs* made clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it. Whether the government does nothing, forcing the owner to bring a takings suit under the Tucker Act, or whether it provides the owner with a statutory compensation remedy by initiating direct condemnation proceedings, the owner's claim for compensation "rest[s] upon the Fifth Amendment."

*Id*. at 2170-2171.

> Relying heavily on *Jacobs* and other Fifth Amendment precedents … *First English* [*Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987)], held that a property owner is entitled to compensation for the temporary loss of his property. We explained that government action that works a taking of property rights necessarily implicates the constitutional obligation to pay just compensation. …. Because of the "self-executing character" of the Takings Clause "with respect to compensation," a property owner has a constitutional claim for just compensation at the time of the taking.

*Id*. at 2171 (internal citations omitted) .

"The government's post-taking actions … cannot nullify the property owner's existing

Fifth Amendment right: '[W]here the government's activities have already worked a taking of all

use of property, no subsequent action by the government can relieve it of the duty to provide

compensation.'" *Id*. at 2171. "A claim for just compensation brought under the Tucker Act is not

a prerequisite to a Fifth Amendment takings claim—it *is* a Fifth Amendment takings claim." *Id*. at 2174 (emphasis in original).   "But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation after a taking." *Id*. at 2175 (cleaned up).  A property owner who prevails against the government for a permanent taking is entitled to "just compensation for the total value of his property." *Id*. at 2176.

The word 'property' in the Takings Clause means "the group of rights inhering in [a] citizen's relation to [a] ... thing, as the right to possess, use and dispose of it." *United States v. Gen. Motors Corp.,* 323 U.S. 373, 378 (1945). Direct government appropriation and physical invasion of private property "give rise to '*per se* taking[s]'" because they are "'perhaps the most serious form[s] of invasion of an owner's property interests, depriving the owner of the rights to possess, use and dispose of the property." *Horne v. Dep't of Agric.,* 576 U.S. 350, 360 (2015) (internal citation omitted).  "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property. See, *e.g., United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (Government's seizure and operation of a coal mine to prevent a national strike of coal miners effected a taking); *United States v. Gen. Motors Corp.,* 323 U.S. 373 (Government's occupation of private warehouse effected a taking)." *Lingle v. Chevron*, 544 U.S. 528, 537 (2005).

Where government requires an owner to suffer a permanent physical invasion of her property—however minor—a *per se* taking under the Fifth Amendment has occurred and the government must provide just compensation. *See Loretto 45*8 U.S. 419 (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking).  Physical takings require compensation because of the unique burden they impose.  "A permanent physical invasion, however minimal the economic cost it entails, eviscerates the

owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests. *Lingle*, 544 U.S. at 539 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–832 (1987); *Loretto*, 458 U.S. at 433; *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

"In giving content to the just compensation requirement of the Fifth Amendment, this Court has sought to put the owner of condemned property 'in as good a position pecuniarily as if his property had not been taken." *United States v. 564.54 Acres of Land, More or Less*, 441 U.S. 506, 510-511 (1979) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)).  The guiding principle of just compensation is that the *owner* of the property must be made whole. *Id*. at 516.

When a property owner is forced to acquiesce to the government's physical occupation of his property, such acquiescence cannot negate a takings claim. "[The] element of required acquiescence is at the heart of the concept of occupation."  *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) (quoting *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)).

Plaintiff is entitled to be completely compensated for the Government's physical use, occupancy, taking, and contamination of his property, including interest, from August 5, 2015 until such compensation is paid in full.

## II.   DEFENDANT'S ARGUMENTS ARE WITHOUT MERIT

The Defendant has presented four meritless arguments to support its Motion to Dismiss.

### A.  The Doctrine of Necessity Does Not Apply Here

`The Government first argues that "the doctrine of necessity bars takings liability for EPA's reasonable response to an actual emergency."  ECF No. 7 at 9.  In doing so it admits that it flooded millions of gallons of acid mine drainage and heavy metals across Plaintiff's property and into the Animas River. *Id*.  It seeks absolution from this Court for doing so by claiming that it had to take Plaintiff's property in order to "respond" to the "emergency" that it created.

22

The flaws in the Government's argument are revealed by the lengths to which it has gone to conflate what happened on August 5, 2015 when it breached the Gold King Mine (the "emergency") with the actions that it took over the next several months to locate, construct, and begin operating a water treatment plant on Plaintiff's property to treat ongoing seepage. Despite Defendant's best efforts to pretend that these were simultaneous, if not one and the same event, Plaintiff has clearly stated in his Complaint and described in detail above (and below) that they were not. By ignoring the differences between its immediate response (or lack thereof, as described in more detail below) to the emergency it created, and its subsequent actions in deciding where to locate, construct, and operate a water treatment facility, the Defendant is intentionally misleading this Court as to the facts of this case. In short, the Defendant's rendition of what occurred at the time of and subsequent to breaching the Mine is untrue, being refuted by the Complaint itself which is entitled to be construed in Plaintiff's favor. *See Briseno*, 83 Fed. Cl. at 632.

In order to avail itself of the "doctrine of necessity" to avoid liability for taking Plaintiff's property, the Government would have to establish as a matter of fact and of law that its response was "necessary" to prevent an identified and "imminent" "emergency," and that such response was "reasonable" under the circumstances. *See Trin-Co Inv. Co. v. United States*, 130 Fed. Cl. 592 (Ct. Cl. 2017). The Government has identified the August 5, 2015 breach of the Gold King Mine as the "emergency": "The inadvertent release of millions of gallons of acid mine drainage from the Mine was an emergency event." ECF No.7 at 9. Plaintiff agrees that the Government caused a catastrophe when it breached the Gold King Mine and flooded the real property and waterways below. Contrary to what Defendant implies, however, EPA did not spring into action as the acid mine waste and heavy metals were gushing out of the Mine, instantaneously construct a water treatment plant on the *only* available land in the area, and thereby intercept and prevent the

contaminated water from reaching either Plaintiff's property or the Animas River in the first place. In fact, and as is pled in the Complaint, EPA did not stop the water pouring out of the Gold King Mine in order to prevent catastrophic harm to either Plaintiff or the general public:

> EPA released a massive sickly yellow/orange (turmeric-colored) plume of contamination from the Gold King Mine. The waters and sludge they released cascaded down the embankment outside of the Gold King Mine, rushed down the mountainside, and quickly overwhelmed Cement Creek, a tributary of the Animas River. This plume of contaminated water, often referred to as "the yellow river seen 'round the world," then snaked down the Animas through Colorado and into New Mexico, to the confluence with the San Juan River. It traveled through New Mexico, the Navajo Nation, and into Utah, reaching Lake Powell one week later.

ECF No. 1 at ¶ 48. EPA then made matters worse by refusing to disclose what it had done until long after the imminent and immediate emergency had passed:

> The EPA employees and contractors who intentionally breached the Gold King Mine failed to notify their EPA supervisors for over an hour after the blowout occurred. EPA did not issue a press release until around midnight that day. EPA did not notify residents of the spill until twenty-four hours after it had occurred. EPA waited an entire day before notifying downstream mayors, health officials, families, farmers, ranchers, fishermen, and recreationists that the water they were using, drinking, irrigating with, and paddling in was contaminated with heavy metals such as lead, cadmium, copper and zinc.

*Id*. at ¶ 50.[3]

It is thus apparent that the Defendant's actions were not taken *to prevent the emergency that EPA created*; EPA in fact *never sought* to prevent the 3,000,000 gallons/880,000 pounds of toxic sludge from pouring out of the Gold King Mine, from cascading down the mountain, from

---

[3] Defendant claims that "the Complaint does not allege that the EPA's initial response to the alleged breach of the Mine was unnecessary or unreasonable – quite the opposite." ECF No. 7 at 12. That assertion is both untrue and bizarre. The two paragraphs quoted above show that EPA's "initial response" was largely non-existent, resulting in damages to Plaintiff's property, as well as to communities and landowners for hundreds of miles downstream. EPA's failure *to do anything* in response to blowing out the Gold King Mine and releasing millions of gallons of toxic sludge is, *by definition*, unreasonable. As for the claim of "necessity" in relation to the "initial response," there is simply no "response" to judge; EPA did not make any effort to contain the release of the contaminated water, nor to prevent it from flooding over the embankment and downstream.

flooding across Plaintiff's property, or from flowing into the Animas River.  All of that happened *before* EPA acted.  The Government, in other words, did not construct a water treatment facility on Plaintiff's property for the purpose of stopping, preventing or mitigating the emergency it created on August 5, 2015—it watched that catastrophe unfold in its entirety, only later notifying downstream communities, landowners, and individuals that contaminated water was headed their way. EPA did nothing to stop that from happening, and built the water treatment plant much later.

Defendant also claims that "[a]ccess to Plaintiff's property was essential to respond to the emergency, *i.e.*, to remediate the extant environmental damage while protecting the health and safety of persons and property downstream."  ECF No.7 at 10.  Plaintiff, however, authorized EPA to use a portion of his property "for an emergency staging area for equipment and supplies…." ECF No. 1 at ¶ 55.  While Plaintiff allowed the Government to use a designated portion of his property for such activities, he "specifically instructed EPA personnel that he was not authorizing EPA to use the Herbert Placer portion of the Gladstone Property for its operations."  *Id.* at ¶ 57. He never intended nor authorized EPA to occupy and use his property indefinitely; only to address the immediate situation.  *Id.* at ¶ 56.  The Defendant ignored the scope of Plaintiff's permission and constructed a $2.3 million dollar water treatment plant on his property, *see id.* at ¶ 59, but only long after the emergency had played itself out (completing the facility in November 2015).

The cases relied upon by the Government further underscore the fallacy of its arguments. Not one of those cases can be likened to the scenario we are dealing with here, as none involved a situation where the emergency had not only long passed when the government began physically occupying said property, but that the taking of the property had nothing to do with preventing the emergency from happening in the first place—which is the rationale for the "necessity" defense.

In *Trin-Co Investment Co.*, the landowner brought a taking claim against the United States alleging that the government took merchantable timber when the Forest Service intentionally lit fires to manage several wildfires advancing through both federal and private land "in order to reduce the opportunity for the advancing wildfire to breach the containment line." 130 Fed. Cl. at 594. The Forest Service, in other words, used "defensive fires" or "backburning" to fight existing and ongoing forest fires; to prevent them from advancing further. By comparison to the Government's response here, the Forest Service did not wait several months, until after the forest fires were already extinguished, to set fire to Plaintiff's timber; the Forest Service was instead using backburning to fight an existing and ongoing fire that had already burned tens of thousands of acres. *Even then*, the Court in *Trin-Co Investment Co.* held that there were several questions of material fact precluding summary judgment, including: (1) whether an "actual emergency" excused the Forest Service's damage to the private property; (2) whether imminent danger from the wildfires threatened life and property; and (3) whether the Forest Service's backburning actions were actually necessary. In reaching that conclusion the Court of Federal Claims quoted from the Federal Circuit's decision reversing an earlier grant of the government's motion to dismiss:

> [H]owever, every taking by the Government in the name of fire control does not automatically qualify as a necessity sufficient to satisfy the requirements of the necessity defense. The necessity defense is just what it says it is: a defense. It has always required a showing of imminent danger. The use of the word 'necessity' in the title is no accident. The defense requires both an actual emergency and an imminent danger met by a response that is actually necessary. Not every seizure of a private citizen's property will qualify.

*Id*. at 595. (quoting *Trin-Co Inv. Co. v. United States*, 722 F.3d 1375 (Fed. Cir. 2013) ("*Trin-Co. II*")). The Court of Federal Claims then considered the question of "whether the necessity defense raised by the government here is susceptible to resolution on summary judgment." *Id*. at 598. "Takings cases are typically fact-specific and often turn on facts that are developed at trial." *Id*.

Again quoting from *Trin-Co. II*, the Court confirmed that "[t]he [necessity] defense requires both an actual emergency and an imminent danger met by a response that is actually necessary." *Id*. at 599.  The Court repeated that "the inquiry is fact-specific and must take into account the particular facts of each case."[4]  *Id*. at 601 (citation omitted).

Defendant's reliance on *Miller v. Schoene*, 276 U.S. 272 (1928) is also misplaced.  That case did not involve a Fifth Amendment takings claim at all, but was instead directed to the question of whether the Virginia Cedar Rust Act, a statute adopted pursuant to the Legislature's police power, violated *the Due Process Clause* of the U.S. Constitution.   The Court did not rule that "[t]here is no compensable taking when the government acts to avert an imminent threat to public health, safety, or welfare," as claimed by Defendant. ECF No. 7 at 9.  That issue was not addressed at all, as there was no takings claim made.  The fact that Defendant has restored to making up court holdings out of whole cloth exposes the weakness of its argument.

The Supreme Court's decision in *Lucas,* 505 U.S. 1003, also provides no support for Defendant, focusing as it does on the "destruction" of real property "in cases of actual necessity, to prevent the spreading of a fire or to forestall other grave threats to the lives and property of others."  *Id*. at 1029 n. 16.  Those are simply not the facts at issue here; the Government did not "destroy" Plaintiff's property to protect the lives and property of others (which, for example, would most likely have required the immediate construction of a dam across the Animas River to prevent

---

[4] Defendant filed a motion to dismiss, not a motion for summary judgment and *all* of the factual allegations in Plaintiff's Complaint must be taken as true. *See Briseno* 83 Fed. Cl. at 632. Such facts contradict Defendant's claim of "necessity" and "emergency."  More importantly, they show that Defendant is intentionally misleading the Court into equating the breach of the Gold King Mine with the construction of the water treatment facility—two entirely separate events, with the first being the flooding of Plaintiff's property (actionable in and of itself), and the second being the construction of a physical structure on private property without paying just compensation. According to the *TrinCo* line of cases, Defendant could not meet its burden of proof for a motion for summary judgment, let alone its burden of proof under a motion to dismiss.

the contaminated water from rushing downstream).  It instead took his property and, over a three-month period, built a water treatment plant.  The *Lucas* decision actually supports Plaintiff's claims here, with the Court reiterating the long-standing requirement that the government's "permanent physical occupation" of land requires just compensation "no matter how weighty the asserted 'public interests' involved."  *Id*. at 1028 (quoting *Loretto* 458 U.S. at 426).

The Court's decision in *Nat'l Bd. of YMCA v. United States*, 395 U.S. 85 (1969), is also inapposite.  That case involved the military occupation of certain privately-owned buildings *for the purpose of protecting* those buildings from looting, rioting, and destruction.  According to the Court: "[o]rdinarily, of course, governmental occupation of private property deprives the private owner of his use of the property, and it is this deprivation for which the Constitution requires compensation."  *Id*. at 92.  Where the private party is the particular intended beneficiary of the governmental activity, however, no such compensation is required.  *Id*.

The Defendant has defined the "emergency" to which it was allegedly responding as the release of over 3,000,000 gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River watershed on August 5, 2015.  The Defendant claims that its "response" was to construct and eventually operate the water treatment facility on Plaintiff's real property. As described above, the problem with that argument is obvious:  Defendant did not construct the water treatment plant to treat the toxic water and heavy metals that immediately drained from the Gold King Mine—they were long gone by the time such plant was operational.  Defendant's claims of "necessity" and "imminent" threat are thus not only factually unsupportable, they defy logic.

The question of whether it was "necessary" for the Government to construct its water treatment facility on Plaintiff's property is highly disputed.  What is not in dispute, however, is that it was not constructed to address the "imminent" threat posed by the release of 3,000,000

gallons of toxic sludge and 880,000 pounds of heavy metals, nor does Defendant *actually* claim that it was (nor could it). That is just one of the facts that the Defendant has cleverly sought to "finesse" in the hopes that this Court will not notice.

Defendant also argues that "[n]or does the Complaint allege that the subsequent construction of a water treatment facility on Plaintiff's property was unreasonable or unnecessary." Defendant's Motion at 12. Importantly, and again by a deft sleight of hand, Defendant seeks to lump the after-the-fact construction of the water treatment facility with the August 5, 2015 "emergency" in order to rope it into the "doctrine of necessity" and avoid paying Plaintiff for the taking of his property. That, however, is not how this doctrine works.

Plaintiff is not required to prove that Defendant's construction and operation of a treatment facility on his property is "unreasonable or unnecessary."[5] *See* ECF No. 7 at 12. "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick*, 139 S. Ct. at 2167. Defendant's desire to take Plaintiff's property because of it was "the optimal location," with good "accessibility," with an "existing power structure," and the right "site conditions," ECF No. 7 at 12, does not change the fact that it is still a taking. Nor does it convert the inquiry into one of "reasonableness"; it just confirms that Plaintiff is entitled to be well-compensated for the very attributes of his property that the Government found so enticing.

Plaintiff has stated a taking claim upon which relief can be granted for Defendant's taking of his property without paying just compensation. The Government's "doctrine of necessity" argument has no basis in fact or in the law and should be rejected outright.

---

[5] Plaintiff alleges in Paragraph 60 of the Complaint (ECF No. 1) that "[t]he BLM owns real property adjacent to and in the vicinity of Plaintiff's property. EPA could have constructed its water treatment facility on those lands." Plaintiff has, in other words, challenged the necessity and reasonableness of Defendant's actions in choosing to take his property for the water treatment plant when there were federal lands in the same exact vicinity.

**B.  Plaintiff Is Not Alleging That the Negligence of the EPA Contractor Gives Rise to a Takings Claim**

Defendant further tries to avoid responsibility for the taking of Plaintiff's property by attempting to fob off all responsibility onto the contractor Environmental Restoration, who was working for EPA at the Gold King Mine on August 4 and 5, 2015.[6]  Plaintiff does not, as Defendant claims, allege that "EPA's contractor negligently caused the alleged breach" of the Gold King Mine.  *See* ECF No. 7 at 14.  According to Plaintiff's Complaint, all decisions and activities conducted at the Gold King Mine on those dates were planned, implemented, undertaken, overseen and supervised by EPA.  *See* ECF No. 1 at ¶ 31-47.  Plaintiff has also identified all the different ways in which the Defendant knew or should have known that its action in breaching the Gold King Mine would result in the invasion of Plaintiff's property right.  The Complaint thus confirms one important fact:  Defendant invaded Plaintiff's protected property interest, and such invasion was the direct, natural or probable result of EPA's decision to breach the Gold King Mine.  *See Cary v. United States*, 552 F. 3d 1373, 1376-77 (Fed. Cir. 2009).

EPA did exactly what it set out to do on August 5th. While Plaintiff has provided examples of why EPA should not have done what it did, and described in detail the problems with the decisions that were made, Plaintiff does not claim that such actions constituted negligence. They were instead deliberate, intentional, and made by EPA with full knowledge of the potential risks.

> EPA and its employees, the very agency and individuals entrusted to protect the environment, violated their own directives, protocols and procedures, while also ignoring the well-understood risk of undertaking this operation, thereby triggering a massive release of pollutants onto the private property below the Gold King Mine (owned by Plaintiff Todd Hennis) and into the waterways downstream.

---

[6] Defendant's "negligence" argument is clearly limited to Plaintiff's taking claim related to the flooding of his property; it does not apply to Plaintiff's claim that the EPA quite deliberately took his property by constructing and operating a water treatment plant on his property.

> EPA's conduct was reckless, deliberately indifferent, and outrageous.  EPA and its employees knew of and disregarded the substantial risk of serious harm to Plaintiff and his property rights.
>
> EPA's intentional breach of the Gold King Mine resulted in the release of toxic heavy metals … which first flooded across Plaintiff's real property below and into Cement Creek for its journey downstream.
>
> ***
>
> It is irrefutable that EPA was the cause and culprit of the Gold King Mine blowout, a fact that it has repeatedly admitted since that tragic day. ….
>
> EPA is an agency and instrumentality of the United States Government.
>
> It is thus irrefutable that the United States is responsible for all of the damages, injury, loss of revenue, and consequences of breaching the Gold King Mine. . . .

ECF No. 1 at ¶¶ 46-47, 49, 52-54.

Defendant is intent upon deflecting attention from the Government's culpability in this case by implying that it was the EPA *contractor's* negligence that caused the catastrophe and taking at hand (which is similar to saying "it was the backhoe's fault"):  "Here, Mr. Hennis claims that the damage to his property occurred because an EPA contractor failed to follow the EPA On-Scene Coordinator's instructions not to excavate earthen debris blocking a portal structure that held back water within the Mine and not to drain the Mine without first setting up the equipment necessary to handle the discharge."  ECF No. 7 at 14-15.  Mr. Hennis, however, makes no such claim. Mr. Hennis in fact points the finger directly at the culpable party in this disaster—the United States Government through the EPA.  Mr. Hennis, in other words, does not argue that the "contractor" negligently blew out the Gold King Mine.  He instead insists quite forcefully that EPA was responsible for every single decision that was made leading up to the breach on August 5, 2015.  Plaintiff has identified a variety of reasons as to why *EPA should not have done what it did* on that day, as well as the types of precautions that it should have taken before breaching the Gold King Mine portal.  The purpose of those facts and allegations is not to pursue a negligence

claim (there is no negligence count included in the Complaint), but to show that the EPA's release of 3,000,000 gallons of acid mine drainage and 880,000 pounds of heavy metals "was the direct, natural, or probable result" of its decision to breach the Gold King Mine.  Plaintiff does not claim that the Government acted negligently when it breached the Gold King Mine—the breach was in fact entirely intentional.  Plaintiff has instead alleged that the EPA knew or should have known that by breaching the Gold King Mine it would be causing severe injury to Plaintiff's lands below through flooding, thereby resulting in a taking requiring just compensation as per the Fifth Amendment.  "… [W]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Ark. Game and Fish Comm'n*, 568 U.S. 23, 31 (2012) (citations omitted).  Government-induced flooding can constitute a taking.  *Id.* at 32.  In *Pumpelly v. Green Bay Co.,* 13 Wall. 166, 20 L.Ed. 557 (1872). "the Court held that 'where real estate is actually invaded by superinduced additions of water, earth, sand, or other material … so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.'" *Id.* at 181.

Defendant admits that "while Mr. Hennis's property loss is certainly partially attributable to an authorized government project – the Gladstone property would not have been damaged but for the alleged breach of the Mine – the complaint makes clear that that damage was not a direct, natural and probable consequence of the project functioning as designed."  ECF No. 7 at 15.  That assertion is untrue.  The project that EPA undertook on August 4 and 5, 2015 functioned exactly as it was designed. The *very purpose* of the project was to breach the portal of the Gold King Mine, which, along with the Government's decision to then appropriate his property for public use, is the directs and proximate cause of Plaintiff's injury.  The fact that EPA knew that the project it was undertaking substantially increased the risk to third parties—including Mr. Hennis—does not

change the fact that EPA intentionally pursued that project anyway. While Plaintiff fully agrees with the Government that EPA should not have intentionally destroyed the Gold King Mine portal, the fact is that it did, and its bad decision cannot shield the Defendant from being liable for the damages that Mr. Hennis suffered as the result.

Stated succinctly, EPA's goal in August 2015 was to breach the portal of the Gold King Mine. It effectively accomplished that goal. EPA's breach of the portal was no accident, nor was it unintentional or inadvertent. EPA accomplished exactly what it intended to accomplish. The problem now is that its intentional act caused severe damage to Plaintiff's property below, resulting in an unconstitutional taking for which it refuses to pay just compensation.

The cases cited by Defendant provide it with no safe-haven from liability. For example, *Ridge Line, Inc., v. United States*, 346 F. 3d 1346 (Fed. Cir. 2003), involved a full-blown trial with appellate review; it was not decided on a motion to dismiss. The Court in *Ridge Line* also understood that circumstances such as those involved here may very well provide the foundation for a takings claim. For example:

- "[I]ntermittent flooding of private land can constitute a taking of an easement…" and "[the] permanent destruction or exclusive occupation by government runoff is not always required for a successful takings claim." *Id*. at 1354.

- "The tort-taking inquiry … requires consideration of whether the effects [the landowner] experienced were the predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." *Id*. at 1355.

- "The line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry. First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.' (Citations omitted). … Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least

preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id*. at 1355-1356.

Water continues to seep out of the Gold King Mine as a result of Defendant's breach of the portal. Plaintiff's Complaint contains sufficient facts to pursue a takings claim against the Government for flooding. He is not pursuing a negligence claim against the contractor and would have no legal basis for doing so. EPA controlled all aspects of the project that day, with the contractor doing exactly what EPA instructed it to do, and Plaintiff has suffered the consequences.

Defendant's Motion to Dismiss based upon its faulty "negligence" claim fails as a matter of law. Plaintiff has stated a claim upon which relief can be granted for the flooding of his property.

### C. Plaintiff Did Not Voluntarily Consent to Defendant's Use of His Property

Defendant next argues that Plaintiff "authorized access to his land to address the emergency caused by the alleged breach of the Mine." ECF No. 7 at 16. Defendant then references the "written access agreements" that it claims "authorized EPA to construct, operate, and maintain an interim water treatment facility and take any other actions necessary to address releases from the Mine." *Id*. There are several flaws with Defendant's argument.

This matter is before the Court on the Government's Motion to Dismiss. "When considering a motion to dismiss brought under RCFC 12(b)(6), the court must presume that the facts are as alleged in the complaint, and make all reasonable inferences in in favor of the plaintiff." *United Communities, LLC v. United States*, 154 Fed. Cl. 676, 680 (Ct. Cl. 2021) (Citation and internal quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. "… Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

Taking as true the Complaint's factual allegations, most specifically Section VI, (as set forth in detail above), it is clear that Plaintiff has met this burden of stating a claim upon which relief can be granted.  Plaintiff has provided more than sufficient factual matter, all of which must be accepted as true, to state a claim that the Government took his property without just compensation.  Plaintiff has also provided sufficient facts, all of which must be accepted as true, that he was coerced into allowing the Government access to his property, *with the understanding, expectation, and reservation of rights to seek compensation from the Government in exchange*. Plaintiff, in other words, has presented facts showing that he never waived his right to seek compensation from the Defendant when he provided access in the face of the Government's threat to ruin him financially if he refused.  For example, as set forth in Paragraph 98 of the Complaint:

> None of the consent for access documents signed by Plaintiff required him to waive any rights or entitlements that he has, with Plaintiff retaining the right to seek compensation for the Government's physical occupancy, use and taking of his property.   EPA has acknowledged Plaintiff's repeated demands that the Government compensate him for using and physically taking his property.

Furthermore, and contrary to Defendant's arguments, the consents signed by Plaintiff do not represent "valid contracts" as they were never signed by the Government and there was no consideration provided; they are not "contracts" at all.  As for the Government's new-found claim that the treatment of the acid mine drainage from Gold King Mine is the "consideration" for these so-called contracts, it is important to keep in mind that such drainage and contamination was caused by the Government in the first place.  The Defendant's argument can be likened to someone who intentionally razes their neighbors' home with a bulldozer, and then demands to be paid for watering the neighbor's garden while they are homeless.  The possibility that Defendant *may* at some point in the indefinite future leave "certain improvements and remedy features." *see* ECF No. 7-4 at 2, whatever that means, is also inadequate consideration.  Such statement is so

ambiguous as to be entirely meaningless, which could be the intent of the Government when it wrote it. Finally, and contrary to Defendant's claim, the only facts before this Court are in the Complaint. Defendant's continued occupation of Plaintiff's property does not provide him with any benefit but is instead a detriment preventing him from pursing his plans for the property: "Defendant's physical occupation, use and taking of Plaintiff's property directly interferes with his use and enjoyment of said property for the foreseeable future." ECF No. 1 at ¶76; s*ee also Id*. at sect. IV.

Defendant's legal analysis is also wrong, with its cases being either distinguishable or further confirmation that Plaintiff has stated a viable taking claim upon which relief can be granted. For example, *Nat'l Bd. Of the YMCA v. United States*, 396 F. 2d 467 (Ct. Cl. 1968), *aff'd*, 395 U.S. 85 (1969), involved cross-motions for summary judgment. The parties thus had the ability to develop the facts underlying the claims made. The Court relied upon the facts surrounding the negotiations that took place between the property owner and the United States with regard to modifications to the building: "*The record is clear*, however, that the parties subsequently agreed upon certain modifications in the installations which satisfied the Lodge's request and conformed to its version of the verbal agreement." *Id*. at 476 (Emphasis added). The court went on to note that the parties themselves did not consider the government's action to be a taking: "There is no indication that either party at any time considered the changes to be a 'taking' within the meaning of the fifth amendment." *Id*. That is not the same circumstance here; Plaintiff has consistently demanded compensation for the Government's use of his property. *See* ECF No. 1 at sec. VI; ECF No. 7-1 ("Regarding the Herbert Placer, Anglo Saxon, and Harrison Millsite properties, Mr. Hennis declined to extend access beyond December 31, 2015 but stated that he is willing to allow the EPA access under a lease, specific terms to be negotiated, at a rate of $10,000 per month.").

The Government responded by threatening to financially ruin him.  Plaintiff's Complaint also describes the fact that he refused to sign a long-term access agreement with the Government, instead signing short-term access documents while he continued to negotiate with Defendant to be compensated for the taking of his property.  *See* ECF No. 1 at ¶¶ 94-99.  In December 2020 Plaintiff had had enough, giving the Government until February 28, 2021 to negotiate in good faith "to pay for past and future use of his property."  *Id*. at ¶ 99.  The Government then made good on its threat and on January 6, 2021 brought an administrative enforcement action against Plaintiff, forcing access to his property and threatening to fine him $59,017 *per day* if he objected. *Id.* at ¶ 100, 102; ECF No. 7-3.  The Government admitted in its January 27, 2021 Modified Order that Plaintiff had never waived his right to pursue a takings claim and just compensation for the use of his property: "Nothing in this Order constitutes a waiver bar, release, or satisfaction of or a defense to any cause of action which Respondent has now or may have in the future against EPA, the United States, or against any entity which is not a party to this Order."  ECF No. 1 at ¶ 102.

Defendant also relies on *Waverly View Investors, LLC v. United States*, 135 Fed. Cl. 750 (Ct. Cl. 2018), to support its motion for dismissal.  That reliance is misplaced.  For example, and like the other cases referenced by Defendant, that decision was not issued in response to a motion to dismiss, but only after the parties had a full opportunity to develop the facts and present their evidence to the court through a trial.  This fact is especially relevant here as it was only through *a thorough analysis of the evidence*, including testimony of the parties and documentary evidence, that the court was able to conclude whether the consent agreement at issue there was unenforceable for coercion or duress.  According to the court, "[t]o render an agreement unenforceable for coercion or duress, a party 'must establish that (1) it involuntarily accepted [the other party's] terms, (2) circumstances permitted no other alternative, and (3) such circumstances were the result

of [the other party's] coercive acts.'"  *Id*. at 793 (citation omitted).  Because the plaintiff in that case "failed to establish the second and third elements of the duress test," the court ruled against it on this issue.  *Id*. The plaintiff there, however, *was given the opportunity* to prove its claims, which is exactly what must happen here.  Stated another way, the very test laid out by the court in *Waverly Investors*, raises questions of fact that cannot be decided on a motion to dismiss.

Defendant's other cases do not support its claims regarding the nature, scope or legal import of the access documents signed by Plaintiff. They are either focused upon regulatory (rather than physical) takings, or contradict the approach that Defendant is urging the Court to take here— dismissal of the Complaint without giving Plaintiff the ability to present evidence regarding what has transpired in relation to its taking and occupancy of his property for the past six-and-one-half years, including his discussions with the Government regarding compensation.

Plaintiff's Complaint states that he did not voluntarily sign the access agreements, and that he has consistently tried to force the Defendant to negotiate in good faith to pay for taking his property. Those allegations alone are sufficient to state a claim.  This is especially so considering Defendant's obligation under 42 U.S.C. § 4651 to either negotiate with Plaintiff or immediately pursue eminent domain, with the following provisions of that statute being the most pertinent:

> In order to encourage and expedite the acquisition of real property by agreement with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:
>
> (1) The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.
> ***
> (4) No owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 3114(a) to (d) of Title 40, for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property….

38

\*\*\*

(7) In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in the court for the use of the owner, or take any other action coercive in nature, in order to compel agreement on the price to be paid for the property.

(8) If any interest in real property is to be acquired by exercises of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings.  No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the takings of his real property.

Defendant's actions throughout this saga have been coercive, heavy-handed and unreasonable, a fact made obvious by its November 10, 2015 letter (ECF No. 7-1), and further highlighted by its refusal to comply with the foregoing statutory obligations.  Plaintiff should have the right to present such proof at trial, and the Government's motion to dismiss should be denied.

Finally, *even if* Plaintiff waived his right to seek compensation from the Government for that period of time during which those access documents were in effect (which Plaintiff disputes), the last of those documents expired on December 31, 2020.  ECF No. 1 at ¶ 99.  It was shortly thereafter that EPA made good on its threats and issued an Administrative Order to prevent Plaintiff from excluding it from his property.  *Id*.  According to *Waverly View Investors*, the Government's continued occupation and use of Plaintiff's property since the expiration of the last access document (December 31, 2020) has "effected a permanent physical taking" of Mr. Hennis's property.  135 Fed. Cl. at 799.   "A compensable taking occurs when the government 'physically invades or appropriates … private property."  *Id*. at 791 (cleaned up).  "A physical invasion or appropriation occurs when 'the government itself occupies the property or requires the landowner to submit to physical occupation of its land.'" *Id*. (Citation omitted).

Plaintiff did not consent to the Government's entry and physical occupation of his property.  Even if, however, there was a period of time when such consent existed (a question of fact), since

December 31. 2020 the Government has occupied his property without permission or consent.  The Government has thus taken Plaintiff's property and he is entitled to just compensation.

### D.  The Compensation to Which Plaintiff Is Entitled Is a Question of Fact for Trial

The Government's final argument is that Plaintiff's claims for consequential damage are not recoverable.  Like its other claims, this one is likewise without legal basis. Plaintiff is entitled to pursue his claims and present evidence regarding the losses that he has suffered a result of Defendant's taking of his property. He should not be prohibited—especially at the motion to dismiss stage—from being able to present evidence regarding what those losses are.  Yet that is exactly what the Defendant is asking this Court to do.  According to *Waverley View*:

> The guiding principle of just compensation, ... is that the owner of the ... property 'must be made whole but is not entitled to more.'"  704 ("[A property owner] is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions."). Because of "serious practical difficulties in assessing the worth an individual places on particular property at a given time," however, the United States Supreme Court has recognized the need to determine "just compensation" through "a relatively objective working rule."

> Thus, just compensation for a permanent taking is "generally" determined by the fair market value of the property taken. … *see also Bauman v. Ross*, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897) (defining "just compensation" as "the value of [property that the owner] has been deprived of, and no more"). "Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking." But,"the quantum of damages" must "be shown to a reasonable approximation," *i.e.*, "estimated with a fair degree of accuracy."

135 Fed. Cl. at 813 (citations and internal quotations omitted).  This is the standard that will govern the compensation that Plaintiff entitled to as a result of the Government's taking of his property.  It would be improper to preemptively block him from being able to show what those damages are.

### CONCLUSION

The Government's Motion to Dismiss is without basis and must be denied.

Dated this 5th day of January 2022.

Attorneys for Plaintiff

_/s/ Harriet M. Hageman_
Harriet M. Hageman (Wyo. Bar #5-2656)
Senior Litigation Counsel
New Civil Liberties Alliance
1225 19th St., NW, Suite 450
Washington, DC 20036
Harriet.Hageman@NCLA.legal
Office Number:        202-869-5210

ORAL ARGUMENT IS REQUESTED